ESTATE OF DOROTHY E. BECK, DECEASED, JOHN F. WALTHEW, ADMINISTRATOR, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 858–66—861–66, 4999–66. Filed May 3, 1971.

---

[1] Cases of the following petitioners are consolidated herewith; Estate of Dorothy E. Beck, deceased, John F. Walthew, Administrator, docket No. 859–66; Dave Beck, docket No. 860–66; Dave Beck, docket No. 861–66; and Estate of Dorothy E. Beck, Deceased, John F. Walthew, Administrator, docket No. 4999–66.

*George E. Constable,* for the petitioners.
*Richard H. M. Hickok* and *Paul G. Wilson, Jr.,* for the respondent.

WITHEY, *Judge:* These consolidated proceedings involve the determination of deficiencies in income tax and additions to tax as follows:

| Year | Deficiency | Additions to tax | | 1954 Code |
|---|---|---|---|---|
| | | 1939 Code | | |
| | | Sec. 293(b) | Sec. 294(d)(2) | Sec. 6653(b) |
| Estate of Dorothy E. Beck, deceased, docket No. 858-66 | | | | |
| 1943 | $1,489.06 | $744.53 | | |
| 1944 | 1,462.02 | 732.01 | | |
| 1945 | 3,628.91 | 1,814.16 | $217.73 | |
| 1946 | 8,141.00 | 4,070.50 | 488.46 | |
| 1947 | 8,714.41 | 4,357.21 | 545.97 | |
| 1958 | 26,932.45 | | | $13,466.23 |
| 1959 | 22,307.15 | | | |
| 1960 | 43,720.90 | | | |
| Dave Beck, docket No. 860-66 | | | | |
| 1943 | $1,444.46 | $722.23 | | |
| 1944 | 1,479.01 | 739.51 | | |
| 1945 | 3,698.08 | 1,849.04 | $177.26 | |
| 1946 | 8,141.00 | 4,070.50 | 487.44 | |
| 1947 | 8,714.41 | 4,357.21 | 545.97 | |
| 1958 | 27,017.46 | | | $13,508.73 |
| 1959 | 22,307.15 | | | |
| 1960 | 43,470.50 | | | |
| Estate of Dorothy E. Beck, deceased, docket No. 859-66, Dave Beck, docket No. 861-66 | | | | |
| 1948 | $46,340.22 | $23,170.11 | $2,987.83 | |
| 1949 | 40,641.57 | 21,041.98 | 2,518.64 | |
| 1950 | 69,594.72 | 34,797.36 | 3,974.74 | |
| 1951 | 92,987.54 | 46,493.77 | 5,497.59 | |
| 1952 | 110,155.14 | 55,077.57 | 6,688.97 | |
| 1953 | 23,476.32 | 11,738.16 | | |
| 1961 | 11,808.47 | | | |
| Estate of Dorothy E. Beck, deceased, John F. Walthew, Administrator, docket No. 4999-66 | | | | |
| Estate tax deficiency | | | | $296,674.66 |

The cases were consolidated for hearing pursuant to agreement of the parties.

The respondent computed deficiencies for the taxable years 1943 through 1953 by use of the net worth and expenditures method. Separate returns were filed for 1943 through 1947 and joint returns were filed for 1948 through 1953. Respondent has asserted the additions to tax for fraud against both Dave and Dorothy Beck for all of the taxable years 1943 through 1953 which are barred by the statute of limitations in the absence of fraud.

During the years 1954 through 1957, petitioners paid $370,110.16 to certain unions which, petitioners assert, was the repayment of funds borrowed during 1943 through 1953. Respondent issued no deficiency notices for 1954 through 1957.

Respondent determined deficiencies for 1958 on three specific item adjustments. Separate returns were filed for 1958 and both deficiencies

are barred in the absence of fraud which respondent asserted against both petitioners.

Deficiencies for the taxable years 1959 through 1961 are based on technical adjustments.

All issues in the estate tax case (docket No. 4999–66) were settled by the parties at the trial with the exception that any deficiencies in income tax and additions to tax which may be found due by the Court in docket No. 858–66 and 859–66, together with interest thereon, will be a deduction allowable in the estate tax case. In addition, attorneys' fees and administrators' fees incurred after trial will be negotiated pursuant to Rule 51.

Many of the adjustments which give rise to the deficiencies asserted in these cases have been resolved in whole or in part by the parties and are not in issue herein either by reason of express concession by the parties hereto or because they were not contested in the pleadings.

This case was heard in February 1969 during a period of 8 days. The evidence consisted, *inter alia*, of a 110-page stipulation of facts, 12 supplemental stipulations, and respondent's exhibits A through FQ; also, the parties stipulated that certain portions of the transcript (substantially all pages) which included over 10,600 pages of testimony of the criminal proceedings in the U.S. District Court for the Western District of Washington, Southern Division, entitled *United States* v. *David D. Beck, et al.,* No. 16515 and No. 16526, is to be regarded as testimony in the instant proceeding. In addition, the evidence in the instant trial consisted of verbal stipulations of the parties, exhibits of petitioners, testimony of 15 witnesses, and about 900 pages of transcript.

The principal issues presented for our consideration are:

### Docket Nos. 858–66 to 861–66, Inclusive

(1) Whether petitioners received income in the taxable years 1943 to 1953 and 1958 which they failed to report in their Federal income tax returns filed for those years and the extent thereof;

(2) Whether any part of the deficiency determined against petitioners in docket Nos. 858–66 to 861–66, inclusive, for each of the taxable years 1943 to 1953, inclusive, and 1958, was due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code;

(3) Whether the assessment and collection of deficiencies determined for the taxable years 1943 to 1953, inclusive, and 1958 are barred by the statute of limitations as provided by section 275(a) of the 1939 Code and section 6051(a) of the 1954 Code;

(4) Whether the petitioners in docket Nos. 858–66 to 861–66, in-

clusive, are liable for additions to tax under section 294 (d) (2) of the 1939 Code in the years 1945 to 1952, inclusive, by reason of substantial underestimation of their declaration of estimated tax in those years;

(5) Whether the fair market value of living quarters furnished to the Becks by the International Brotherhood of Teamsters in 1958 to 1961, inclusive, was $12,000 per year, as determined by respondent;

### Docket Nos. 858–66 and 860–66

(6) Whether the amount of $1,514.95 received by Dave Beck as a travel allowance from the International Brotherhood of Teamsters in 1958 was expended by him for a valid business purpose;

(7) Whether the Becks in 1960 received from Sunset Distributors, Inc., as a result of the settlement of a lawsuit, *inter alia*, a 10-year lease having a fair market value of at least $85,000 which constituted taxable income to petitioner in that year;

(8) Whether the Becks are entitled to deduct from their Federal income taxes in 1960 alleged interest expenses paid on behalf of C. N. Lantz and Dave Beck, Jr., in the respective amounts of $597.14 and $453.34; and

### Docket Nos. 859–66 and 861–66

(9) Whether the Becks are entitled to deduct from their Federal income taxes in 1961 alleged interest expenses paid on behalf of C. N. Lantz and Dave Beck, Jr., in the respective amounts of $1,360.24 and $610.24.

#### FINDINGS OF FACT

Part of the facts are stipulated (orally and in writing) and together with stipulated exhibits are so found and incorporated by this reference.

## Background and General Findings of Fact

During the years 1943 through November 24, 1961, the petitioners Dave Beck and Dorothy E. Beck (hereinafter sometimes referred to as the Becks) were husband and wife residing in Seattle, Wash. Dave and Dorothy Beck filed separate Federal income tax returns for the years 1943 to 1947, inclusive, 1954, and 1957 to 1960, inclusive. They filed joint Federal income tax returns for the years 1948 to 1953, inclusive, 1955, and 1956. A joint Federal income tax return was filed by Dave Beck (hereinafter sometimes called Beck) and the Estate of Dorothy E. Beck for 1961. These income tax returns were filed with the district director of internal revenue at Tacoma, Wash. Dorothy E. Beck

died on November 24, 1961, and her estate is a petitioner herein by its administrator, John F. Walthew, Seattle, Wash. The Federal estate tax return for the Estate of Dorothy E. Beck was filed with the district director at Tacoma, Wash. At the time of filing their petitions with the United States Tax Court, petitioners were residents of Seattle, Wash.

By way of background, Beck is the past president of the International Brotherhood of Teamsters (sometimes referred to hereinafter as International Union). He has been active in various union organizations through his adult life. He began his career in 1915 or 1916 as a laundry wagon driver. In 1923, he was elected president of local 566, Laundry and Dye Workers. Shortly thereafter, Beck became president of the Joint Council of Teamsters No. 28, Seattle, Wash. (sometimes hereinafter referred to as Joint Council No. 28), and continued in that office until 1953. In 1926, he was appointed an organizer for the International Union. In 1934, he was instrumental in forming and was elected president of the Joint Council No. 28 Building Association (sometimes hereinafter referred to as the Building Association) which office he continued to hold until 1953. In 1937, he organized and became the chairman or president of the Western Conference of Teamsters (sometimes hereinafter referred to as Western Conference) which office he also held until 1953. In addition, he was elected a vice president of the International Union in 1940 and was made executive vice president of that organization in 1947. Five years later, in October 1952, he was elected president of the International Union which office he held until 1957.

Beck also held a number of other union offices. From 1950 to 1954, he was a member of the executive council of the American Federation of Labor. In 1949 he was a delegate to the British Trade Union Congress. From 1946 until 1951, he was a member of the executive board of the Union Label and Service Trades Department of the American Federation of Labor. Beck was also active in civic and community affairs and served on the board of regents of the University of Washington.

The International Brotherhood of Teamsters, the parent union, has approximately one and a half million members. Its organizational structure is comprised of four area or regional conferences, 17 trade divisions, 60 joint councils (embracing a State or metropolitan area), and some 900 locals. Its revenue is derived mainly from a per capita tax on members and income from investments. When Beck took office as president of the International Union on December 1, 1952, its headquarters was in Indianapolis, Ind. In March 1953, the headquarters was moved to Washington, D.C. Beck's salary as a vice president of the International Union was $25,000 a year; as president he received $50,000 a year.

The Western Conference of Teamsters is a regional organization comprised of all Teamster locals (and their members) within 11 western States, Alaska, Hawaii, and a part of British Columbia. It was formed by Beck in 1937 and chartered by the International Union in 1947. Its purpose is to negotiate for and establish in its area uniform wages for all crafts represented by the various locals. The Western Conference had no constitution adopted in that year. Its governing body consisted of the officers, a policy committee, and an executive board consisting of the officers and three trustees.

The receipts of the Western Conference consisted of a per capita tax of from 10 to 20 cents a month on each member of the affiliated locals. During the period 1950 to 1953, there were approximately 240 locals in the Western Conference with a total membership of some 300,000.

The Joint Council of Teamsters No. 28, also chartered by the International Union, is a statewide organization. Its membership consists of the officers and trustees of each of the Teamsters' locals in the State of Washington, save two. It had no constitution or bylaws. Its revenue consisted of a per capita tax of 30 cents a month for each member of the affiliated locals.

The Joint Council No. 28 Building Association is a nonprofit corporation organized in 1934 under the laws of Washington to acquire and hold title to real property for the use and occupancy of the various Teamster locals in the Seattle area. Among other things, it held title to the Teamsters Building in Seattle. Its receipts consisted of the rent paid by some 20 locals for office space in that building and special charges paid by them for hall rental. The Building Association had a tax-exempt status for purposes of the Federal income tax. However, it was required under the revenue laws to file annually an information return (Form 990) reporting in detail its receipts and disbursements for the year and its assets, liabilities, and net worth as of the end of the year.

Beck and Frank Brewster were president and secretary-treasurer, respectively, of the Western Conference and the Building Association from the inception of each of the organizations until 1953. During the same period they were also president and secretary-treasurer, respectively, of Joint Council No. 28, Beck having served as president of this organization continuously from 1924. Beck drew no salary from these organizations. The offices of each of these organizations were in the Teamsters Building in Seattle. In January 1953, Brewster succeeded Beck who was then head of the International Union as president of each of the organizations with Beck assuming the title of president emeritus. However, Beck continued for some time thereafter to occupy the same office space in the Teamsters Building.

Beck and Brewster, with one exception not disclosed in the instant proceeding, were the authorized signators on and were solely responsible for the funds and all bank accounts maintained by the Western Conference, the Building Association, and Joint Council No. 28. The signatures of both Beck and Brewster were required on all checks drawn against the accounts (with the exception noted in the preceding sentence hereof). Beck's name was not removed as an authorized signator on the accounts until 1954. The various union funds referred to hereinafter, such as the Joint Council No. 28 Legislative Fund, were bank accounts. During the years in question, the Western Conference had at least two bank accounts or funds, one a general fund, and the other labeled "Radio Fund." Brewster was not a signator on and in fact had no knowledge of the Radio Fund account. Joint Council No. 28 maintained at least five bank accounts or funds, referred to herein as the general, legislative, promotional, legal, and convention funds. The Building Association had only one bank account. All of these aforementioned accounts were in the Seattle-First National Bank.

The Western Conference had a policy committee which made recommendations to the executive board. Beck and Brewster were the active executive officers of these organizations and their recommendations to the policy committee and the executive board were relied upon. While Beck and Brewster ostensibly controlled the affairs of the three aforementioned union entities, it was Beck who played the dominant role. In practice, Beck had unlimited authority in running these union entities.

From 1949 through 1953, the books and records of the Western Conference and the Building Association were kept by Donald McDonald. McDonald was bookkeeper for the Western Conference from March 1949 to September 5, 1958. The books and records of Joint Council No. 28 were kept by Laurita Agapoff and Fred Verschueren, Jr. Verschueren kept the records for the promotion and legal funds. A cash receipts and disbursements book and a checkbook were kept for each of the aforementioned accounts or funds.

Prior to the taxable years involved herein, the Federal income tax returns of petitioners were audited on several occasions by the Internal Revenue Service. During 1934, Beck's income tax return for the year 1932 was audited by the Internal Revenue Service and additional tax in the amount of $250 was agreed to on the basis that petitioner did not include in income a $5 per day incidental expense allowance received from the International Union. Beck was advised by the examining officer that the $5 per day incidental expense allowance was taxable income to the extent that this amount was not actually expended for business.

Subsequently, in 1938, while examining the Federal income tax returns of Dave and Dorothy Beck for the years 1934 to 1937, inclusive, Revenue Agent Machin advised petitioners that unexplained bank deposits and incidental expense allowances received by Beck from the unions and unreported by the Becks in their returns were taxable income. The Becks agreed and paid additional tax plus a negligence penalty on the unreported income. During the course of this examination, Beck explained that his wife kept their records. Dorothy Beck, Jacob Lighter (the Becks' representative), and Revenue Agent Machin accordingly spent a considerable amount of time in Lighter's office going over the Becks' records.

In 1943, after examining the Federal income tax returns of the Becks for the years 1938 to 1942, inclusive, Revenue Agent Machin advised the Becks that incidental expense allowances received by petitioner from the unions and unreported by the Becks in their returns filed for those years were taxable income. The Becks agreed and paid additional tax on the unreported income.

During the examination by the Internal Revenue Service of the Federal income tax returns filed by petitioners for the years 1938 to 1942, inclusive, the Becks, through Jacob Lighter, their representative, furnished to the Internal Revenue Service a net worth statement purporting to show that the Becks' net worth as of the end of the year 1942 was about $63,000. The net worth statement was erroneous in that the Becks completely omitted therefrom the following six items which were in fact their assets as of December 31, 1942:

| | |
|---|---|
| $54.27 | Savings account balance. |
| 5,314.40 | Investment in Sick's Seattle Brewing & Malting stock. |
| 2,500.00 | Investment in Queen Anne Broadcasting Co. bonds. |
| 2,300.00 | Investment in real estate (lot 3, block 68). |
| 7,000.00 | Investment in real estate construction at Sheridan Beach. |
| 6,953.00 | Investment in Union Labor Life Insurance.[2] |

Donald D. McDonald, bookkeeper for the Western Conference, wrote checks on the verbal instructions of Beck to hotels, restaurants, and Nathan Shefferman, the latter to be discussed, *infra*, but McDonald was not given any details as to how these checks were to be charged to the local union on which the checks were drawn. Beck did not give McDonald any invoice or voucher with the oral instructions for such payments. Checks which McDonald wrote in payment of Beck's hotel or restaurant bills varied considerably in amounts, and in some in-

---

[2] Although this net worth statement is entitled "Dave Beck," it included the alleged assets of both petitioners. Both petitioners' returns were being examined by the Internal Revenue Service and it was recognized by the examining agents that the Beck's assets were community property.

stances were $2,500 if he was paying for a large meeting or rental of a room for a luncheon. Beck did not submit any record to the bookkeeper for such large expense items as luncheons to distinguish the expenditure from his own hotel bills. In some instances, various union entities with which Beck was associated would pay him an expense allowance for expenditures incurred on their behalf and at the same time they were charged for the identical expenditures and paid the amount involved to the creditor.

Beck received regular monthly expense allowance from the International Union even though in most instances the International Union or one of the other union entities paid most of his actual business expenses by means other than the monthly expense allowances. Beck was never required to repay any expense allowance received from the International Union during any of the years in issue and he never in fact made any such repayments, voluntary or otherwise. At no time during the years under review did he keep records of his travel expenses. During the taxable years 1943 to 1953, inclusive, the Becks did not report in their Federal income tax returns the receipt of any expense allowances which they had received from the various union entities during that period. Following are the facts as to two instances (i.e., "travel expense—$1,514.95" and "trip to Europe—$12,000") which exemplify the modus operandi of petitioner in reporting the receipt of expense allowances from the union entities.

(a) *Travel expense—$1,514.95.*—Petitioner reported in his Federal income tax return for the year 1958 the receipt of a travel expense allowance amounting to $1,514.95 from his union. Also in this return, he claimed a deduction for travel expenses allegedly incurred and paid by him in the same amount. Beck did not in fact pay the travel expenses claimed and deducted in his return. Dorothy Beck (who resided in a community property State) shared in the benefit of this claimed deduction through the filing of a separate return for the year 1958 in which she claimed one-half of the total income and deductions set forth in the 1958 return filed by petitioner.

(b) *Trip to Europe—$12,000.*—Petitioner was a delegate to the British Trade Congress which was held in England during July 1949. To defray the cost of his trip, the Western Conference advanced $5,000 to Beck on or about July 5, 1949, and the International Brotherhood of Teamsters likewise paid him $5,000 for the same purpose on July 21, 1949. In addition and for the same purpose, Beck received $2,000 from the American Federation of Labor about the same time. The total amount of these advancements, $12,000, was deposited in the bank account of Dorothy Beck and was not used for the trip to Europe.

Petitioners, Raymond Leheney and his wife Theresa flew to England

in July 1949 to attend the British Trade Congress and thereafter they traveled to several other European countries. They remained on the Continent for about 12 weeks purportedly on "official business" on behalf of the aforementioned union entities. Theresa Leheney was allegedly the secretary for Beck with respect to union business on this trip.

Petitioners did not report the $12,000 on their Federal income tax return for the year 1949. During the course of the examination of their return for that year, Revenue Agent Donald W. Osborn analyzed Beck's bank account and concluded that the money he spent in Europe had not come out of his bank account and requested an explanation from Ludwig Lobe of Friedman, Lobe & Block, the accounting firm authorized to represent the Becks in connection with the aforementioned audit. Lobe informed Revenue Agent Osborn in writing that Theresa Leheney "as his [Beck's] secretary" was in Beck's company "on official business" during his visit to Europe. Lobe's letter, in pertinent part, states:

> After checking with The International Brotherhood of Teamsters and The Western Conference, as well as with The American Federation of Labor, it was ascertained that the amount of $10,000.00 represented by two checks of $5,000.00 each, were expenses reimbursed or allowed to Mr. Beck for a journey to Europe, which I shall explain more in detail below.
>
> One check of $5,000.00 was paid to Mr. Beck by The Western Conference on or about July 5, 1949; the other also in the amount of $5,000.00, was paid by The International Brotherhood of Teamsters to Mr. Beck on or about July 21, 1949.
>
> These two checks are in addition to an amount of $2,000.00 or $3,000.00, which Mr. Beck received from The American Federation of Labor, and which appears on Mr. Beck's deposits either on July 27 or August 4, 1949.
>
> The two checks deposited of $1,000.00 each, were repaid by the firm of Leheney & Short, a publicity agency, to whom Mr. Beck had previously loaned a sizeable amount of money.
>
> As far as travel expenses are concerned, I submit to you that Mr. Beck was in Europe for twelve weeks on official business for The American Federation of Labor, The International Brotherhood of Teamsters, and The Western Conference. He attended a number of conferences and meetings, and at many of these he also had speaking engagements.
>
> Since, at that time Mr. Beck had kidney stones, his physician insisted that Mrs. Beck accompany her husband on this trip. Furthermore, Mr. Ray Leheney, as Mr. Beck's assistant, and Mrs. Leheney, as his secretary, also were in his company on official business, and the amount shown was paid, therefore, not only for Mr. and Mrs. Beck, but also for Mr. and Mrs. Ray Leheney.

In the same letter Lobe also stated that the cost to Beck of flying to Europe was in itself in excess of $5,000. These statements were made in an attempt to establish that the unreported amount of $12,000 received by Beck from union entities was not taxable to the Becks (i.e., would be deductible as business expense).

Actually, Theresa Leheney was never Beck's secretary at any time;

and the cost of flying to Europe was charged to Beck's air transportation credit card and was paid by the International Union directly to the airlines. Beck possessed and used a Universal Airline credit card which was issued to him by the International Union and which, during the years 1949 through 1953, he used for the purpose of charging the cost of all of his airline tickets to the International Union.

(c) *Destruction of union records—use of net worth method.*—On January 6, 1954, Claude Watson, a special agent for the Internal Revenue Service, was assigned the task of examining the Federal income tax returns of the petitioners. He, together with Special Agent Everett D. Holtberg, met with Beck on January 11, 1954, in the latter's office at the Teamsters Building in Seattle. The primary purpose of this meeting was to advise Beck that his Federal income tax returns were under investigation.

At this meeting, petitioners were asked by the special agents if he would make available to them his personal records and the union records. Beck stated at that time to the agents that although his records for the years prior to 1951 were "spotty," he had good records for 1951 and 1952. However, Beck did not furnish any records to the agents at that time or at any other time as a result of this meeting.

On March 18, 1954, Special Agent Watson again met with petitioner together with Revenue Agent Garrett and Beck's representative. At this meeting the agents advised Beck that they were going to reexamine his 1949 income tax return. They presented Beck with a letter informing him of the necessity therefor and requested that he furnish to them his books and records for that purpose. Beck did not make his books and records available to them.

In July of 1954, in response to an administrative summons served by the agents upon Samuel Bassett, the attorney representing the Western Conference and the Building Association, Bassett declined to furnish the agents with the records of these organizations for the year 1953 and prior years.

Sometime around the first of February 1954, the union records of the Western Conference and the Building Association for the year 1953 and all prior years were taken from the desks and filing cabinets in the office of Donald McDonald, who was the bookkeeper for the Western Conference. This was done at the direction of Robert L. Graham, a general organizer for the International Union and secretary-treasurer of the Western Conference, who, 3 months after the incident described herein, became asistant to the president (Beck) of the union.

After the removal of the union records from McDonald's office, they were placed on Graham's desk. Graham put the records of the Building Association and Western Conference in cardboard boxes and "person-

ally took them downstairs" and placed them in a combination store-room and vault in the basement of the office building. There were several storerooms in this basement. The door was kept locked with a key. The records placed in the boxes included the cash receipts and disbursement records, cashbook, the checkbook, the canceled checks, bank statement, deposit books, and paid voucher files of the Building Association and Western Conference. At this time, the records of Joint Council No. 28 for the year 1953 and all prior years were also placed in this vault by Fred Verschueren, Jr., a bookkeeper for Joint Council No. 28. Within an hour or two after all of these records had been placed in the combination vault and storeroom, Graham directed the building custodian, Martin Vollaugh, to "clean out the vault and storeroom."

Within a few days following their placement in the vault of the Teamsters Building, the aforementioned records were removed and destroyed. The circumstances of this so-called "inadvertent destruc-tion" were as follows: Joseph Romedo, an employee of the Seattle Sanitary Disposal Co., was called by his company at night to pick up some trash. Romedo drove his truck to the Teamsters Building at the appointed hour [3] and was met there by three men, one of whom was Martin Vollaugh, the custodian. At the direction of the custodian, the boxes containing the union records were taken from the building basement, loaded on the trash truck, and thereafter transported by Romedo to the "city dump" (Interbay Garbage Dump) and burned. The two men who had been with the custodian at the union hall while Romedo was loading the records on the trash truck followed Romedo to the dump in their own car. They stayed to watch Romedo burn the records and did not leave until the records were incinerated, some 30 minutes after the records had been set afire.

The trash removed by Romedo during the incident was typical office trash and consisted of many cardboard boxes (about 20) that half-filled his truck.

Vollaugh, the janitor, was not called as a witness at the criminal trial in Tacoma. He was deceased at the time of the instant proceeding in February 1969.

During the course of this investigation of Beck's financial affairs for the taxable years involved herein, Beck attempted (successfully in some cases and unsuccessfully in others) to place third-party records

---

[3] When Romedo was questioned by Special Agent Holtberg in December 1958 with regard to this job, he stated that he arrived at the Teamsters Hall at about 5 o'clock in the morning and "it was dark." Romedo also stated that the men who accompanied him to the city dump told him that they would give him some gas to burn the records; that when he was unloading the boxes at the dump several of the boxes broke open and he saw manila folders used in offices for filing records, and that these records contained pages with writing and figures.

beyond the reach of the agents where such records had a bearing on his fiscal affairs. Simon Wampold, an attorney for and official of the Western Conference, was told in the summer of 1954 by Beck to get in touch with Occidental Life Insurance Co. and ask that company to return "immediately" a financial statement which Beck had submitted to the latter in 1951 in support of loan applications made by Beck. The insurance company honored Wampold's request. Three weeks thereafter, the investigating agents called at the office of the Occidental Life Insurance Co. and were informed that the company had returned the financial statement under the circumstances described herein and that the company no longer had a copy of the statement in its files.

Also in 1954 or 1955, Beck requested the Seattle-First National Bank to return to him the financial statements which he had filed with it in 1948, 1949, 1950, and 1952. However, on March 3, 1954, the agents had obtained copies of these statements from a bank official.

In the financial statement which Beck had furnished to the Occidental Life Insurance Co. in 1951, there was no indebtedness reflected on the part of Beck to any union entity. In this financial statement, he admitted having assets in January of 1951 totaling $1,052,715.65, and a total liability consisting of a bank loan from the Security First National Bank of Seattle in the amount of $234,000. These assets were based upon market value and not upon costs.

Likewise, in none of the financial statements submitted to the Seattle-First National Bank by Beck was there reflected any indebtedness on the part of Beck to any union entity.

Respondent did not have access to the books and records of the union entities mentioned hereinabove (which had been destroyed at the city dump) for the year 1953 and all prior years involved herein, or most of the Becks' records except those relating to the B & B Investment Co., to be discussed *infra*, and hence this case has been predicated in the main upon the use of third-party records. Likewise, since there were no books or records of the petitioners except those relating to the B & B Investment Co., it became necessary for the investigating agents to reconstruct petitioners' income for the taxable years 1943 through 1953, inclusive, by employing the net worth plus expenditures method.

Prior to March 31, 1954, Revenue Agent Garrett had informed Special Agent Watson that the unreported income of the Becks which he (Garrett) had determined under the net worth method of reconstructing income for the years 1943 to September 1952, inclusive, totaled $194,513.38. In a meeting with Lobe, Beck's accountant on or about April 1, 1954, Special Agent Watson discussed with Lobe the

progress of the Government's investigation of Beck and disclosed to Lobe that the amount of the understated income which had been determined by the agents as of that time was $194,513.58.

(d) *Repayment of alleged loans by Beck.*—On July 7, 1954 (about 3 months after the aforementioned discussion between the special agent and Lobe), Beck and Frank Brewster, as president of Joint Council No. 28 and of the Western Conference, executed an "accord and satisfaction agreement" which recited that Beck would pay $200,000 to the Joint Council No. 28 Building Association and the Western Conference of Teamsters in full satisfaction of purported advancements of funds of those union entities to Beck over the years. This agreement reads, in pertinent part, as follows:

WHEREAS, First Parties, both individually and jointly have over a period of years advanced funds in various amounts at different times to Second Party; a part of said advances being made for use by Second Party for the benefit of one or both of the First Parties, and the remainder as a loan and for the benefit of Second Party; and

WHEREAS, the books and records of all parties are not in sufficient detail (1) to clearly and adequately distinguish between funds advanced for the benefit of First Parties and those advanced as loans for the benefit of Second Party and (2) to determine the exact amount due from Second Party to First Parties, as of December 31, 1953; and

WHEREAS, Second Party is desirous of making a final settlement of his indebtedness to First Parties and has offered to forthwith pay to First Parties the sum of Two Hundred Thousand Dollars ($200,000.00) in cash, providing that a full accord and satisfaction is reached between the parties hereto with respect to the indebtedness of the Second Party to the First Parties up to and including December 31, 1953; and

WHEREAS, First Parties deem it to their best interest to accept such offer on the terms and conditions hereinafter set forth;

Now, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the parties do mutually covenant and agree as follows:

1. Second Party shall pay to the joint order of First Parties the sum of Two Hundred Thousand Dollars ($200,000.00) in lawful moneys of the United States upon execution of this agreement.

2. First Parties hereby agree jointly and severally to accept the said $200,000.00 payable to their joint order in full, final and complete settlement and discharge of any and all indebtedness, up to and including December 31, 1953, of Second Party to either or both of First Parties.

This agreement was thereafter modified by further agreements between the parties dated December 30, 1954, and December 29, 1955, increasing the amount payable by petitioner to these entities to $250,000 "more or less." The agreement dated December 30, 1954, reads in part as follows:

Reference is made to that certain written Accord and Satisfaction Agreement which we entered into on July 7, 1954 whereby in payment to you of the sum

of $200,000.00 by me, I was given a complete settlement and discharge of any and all indebtedness as of December 31, 1953 to either or both of you. At that time said Accord and Satisfaction Agreement was based upon the premises that the records of each of us were not in sufficient detail to, among other things, adequately determine the exact amounts due from me to you as of December 31, 1953, and that the sum of $200,000.00 was the best estimate that we could determine as of that date as to the amounts due from me to you.

Since that time I authorized my attorneys to employ certified public accountants to make an independent audit of my financial affairs from 1942 through December 31, 1953, to ascertain, in so doing, the amounts due you as of December 31, 1953. Today my attorneys and said accounting firm have advised me, after spending over 700 hours in examining my books and records and other sources of information pertaining to my financial affairs, that to the best of their judgment and ability, they have determined that the total amount due you as of December 31, 1953 amounts to $250,000.00.

As it was always the understanding between you and me that all amounts advanced by you for my account should be fully repaid, I hereby offer to amend the said Accord and Satisfaction Agreement in the following respects:

1. That the amount of money to be paid to you be increased from $200,000.00 to $250,000.00, payable as follows: $200,000.00 in cash as of July 7, 1954, and the balance, to-wit, $50,000.00, in cash on or before December 31, 1955, said balance to be evidenced by a promissory note which I have executed and enclose herewith.

2. In the event that my accountants above named, and such accountants of your selection, jointly determine within one year from date hereof that the balance due you as of December 31, 1953 is more or less than the said $250,000.00, there will be a corresponding adjustment made between us.

Again on August 18, 1956, the parties modified their agreement so that the amount payable by Beck to these union entities was increased to $270,110.16 "more or less." Thereafter on April 25, 1957, the parties further modified their agreement so that the ultimate amount payable to these entities was $370,110.16. This agreement reads, in part, as follows:

Thus far, under the terms of the above referenced agreement, I have heretofore paid you the sum of $270,110.16 being the minimum amount as determined by the Certified Public Accountants due you as of December 31, 1953, arising out of loans made to me during the period January 1, 1943, to December 31, 1953.

I and my attorneys and their auditors have continued with the examination of my books and financial affairs and other sources of information pertaining to my financial affairs to ascertain what further sums, if any, are due you arising out of said loans. While no definite amount has to date been finally determined, from current studies it appears that I may still owe you an additional $100,000.00.

In view of this possibility, I am enclosing herewith a bank draft in the sum of $100,000.00 payable to your order as a further payment on said loans from you. Said payment, however, is subject to adjustment under the same terms and conditions as apply to the previous $270,110.16 payment under our agreement above referenced in the event that the final determination shows such an adjustment in favor of either party to be necessary.

As under our present agreement (see your letter August 18, 1956) the time for making a final determination of the amount due you will expire June 30, 1957, I

respectfully request that you have your representatives meet with mine at once in order that we may bring this matter to a final conclusion. Should the time be too short, I am willing to extend it for an additional six (6) months if you so desire.

It is stipulated that petitioner paid jointly to Western Conference of Teamsters and Joint Council No. 28 Building Association the following amounts in the following years:

| | |
|---|---|
| July 7, 1954 | [4] $200,000.00 |
| Apr. 2, 1956 | 50,000.00 |
| Sept. 15, 1956 | 20,110.16 |
| Apr. 25, 1957 | 100,000.00 |
| Total | 370,110.16 |

Prior to the production of the so-called accord-and-satisfaction agreement, there was no record whatever of any indebtedness by Beck to any union entity. Beck executed no promissory notes, paid no interest on the amounts allegedly "borrowed" from the union entities, and had no understanding with them as to the terms of repayment. Prior to 1954, Beck had never mentioned the existence of any such "loans" from the union entities to Lobe, his accountant, or any other person.

In 1954, Beck gave Simon Wampold an affidavit which Beck had written out in longhand. This document purported to represent that Beck had authority to borrow money from the union and lend money to others and it also related to the asserted general authority of Beck. Wampold made a few grammatical changes in the document and gave it back to Beck. Thereafter, in mid-1954, Beck gave the handwritten document to his secretary to type and after typing the document she gave it to Beck.

The affidavit, pursuant to Beck's direction, was presented to Sam. DeMoss, a member of the Western Conference Policy Committee; and Wampold and Fred Verschueren, Jr., acting on Beck's instructions, asked DeMoss to sign the affidavit. DeMoss refused to sign it because the affidavit contained erroneous statements, many specifics with which he was not familiar, requiring surmises and guesses on his part.

When the affidavit was presented to William E. Franklin, a member of the policy committee of the Western Conference, for his sig-

---

4 The record shows that a check in the amount of $200,000 dated July 7, 1954, drawn on the B & B Investment Co. by Dave Beck was deposited to the account of the Joint Council No. 28 Building Association. George Kachlein, an attorney who drafted the so-called accord-and-satisfaction agreement which called for the payment of the $200,000 in question, testified that he did not know any facts with respect to the actual payment of the money and did not have any recollection as to how the $200,000 was allocated for the benefit of each of the union entities involved.

nature by Fred Verschueren, Jr. (a bookkeeper for Joint Council No. 28), Franklin signed it under protest. The reason Franklin protested was that the affidavit erroneously asserted, among other things, that Beck had authority to borrow funds from the Western Conference; that the signators of the affidavit were aware that Beck had borrowed such funds; that Beck had authority to maintain residence facilities for union personnel; and that Beck had authority to entertain at home in order to promote the Western Conference, including the authority to charge to the Western Conference expenses connected with maintaining life guards for the Beck swimming pool, operating motion picture equipment, and other expenses incurred at the Beck residence.

(e) *Per diem allowance payments to Beck.*—In addition to the salary which he received from the International Union ($25,000 a year as vice president and $50,000 a year as president), Beck received a per diem allowance which was paid to him whether or not he was in travel status. This per diem allowance when paid by International Union to Beck was deposited, along with Beck's salary, in his wife's bank account. The Becks did not report the receipt of any of these per diem allowances in their Federal income tax returns filed for any of the taxable years 1943 to 1953, inclusive.

The hotel allowance which Beck received from the International Union was paid to him regularly and automatically whenever he was not in Seattle. This practice was followed even when Beck was renting an apartment in Washington, D.C., during his stay there and the International Union was paying the rent on the apartment. As in the case of the per diem allowance, these hotel allowances when paid by the International Union to Beck were deposited along with his salary in his wife's bank account. In numerous instances, Beck lived at hotels in various cities to which he traveled and his union paid the hotel bill, including his travel expense. The Becks did not report the receipt of any portion of the aforementioned hotel allowances in their Federal income tax returns filed for the years 1943 to 1953, inclusive.

(f) *Preparation of petitioners' returns for the period involved.*—In the course of preparing the Beck's Federal income tax returns for the years in issue, the Becks' accountant, Lobe, on at least two occasions, asked Beck to furnish him with information concerning his assets and liabilities. Beck told Lobe that such information was none of Lobe's business and Beck did not furnish him with the information requested.

Beck furnished to Carl Houston, an associate of Lobe's, certain information concerning one of Beck's bank accounts. This was the "B & B Investment Account," a bank account which Beck had set up pursuant to Lobe's advice that Beck should clear all of his business transactions

through one bank account. Beck at no time gave his accountants any information regarding his individual bank account or the individual bank account of his wife.

Likewise, Lobe was not informed by the Becks at any point while preparing their income tax returns that Beck was submitting hotel bills and restaurant bills to the union entities for payment and that Beck was at the same time receiving hotel and expense allowances from these union entities. Lobe first learned of these double allowances after the investigation of the taxable years involved herein by the revenue agents was underway and he was contacted relative thereto.

During the period when Lobe or his associates were preparing the Becks' tax returns, Beck displayed to Lobe that he (Beck) had knowledge of tax matters such as capital gains and capital losses. On one occasion during this period, Lobe recommended to Beck that he have an audit performed and Beck refused.

(g) *Sunset Distributors, Inc.—$85,000.*—In 1951, D. B. Investment Co., which was wholly owned by Beck, purchased a building for $45,386.49 which it leased to Sunset Distributors, Inc., in the same year. Sunset was a beer distributor in Seattle. In 1955, Sunset purchased the building from D. B. Investment Co. for $100,000. The Becks reported the sale of "D. B. Investment Property" in their return for 1955. In 1960, Beck brought suit against Sunset to recover $95,000 indebtedness of the latter to him for services which he had rendered to it during the years 1950 to 1959, inclusive.

The aforementioned building had been mortgaged for $85,000 on November 1, 1960, by Sunset with the Seattle-First National Bank. In 1960, the lawsuit between Beck and Sunset was settled by the conveyance by Sunset to Regrade Improvement Co., Inc. (which was wholly owned by Beck), of the building in question. Sunset retained the obligation to pay the Seattle-First National Bank the $85,000 indebtedness secured by the mortgage.

In addition to the conveyance of title to the aforementioned building to Beck on December 15, 1960 (about 2 weeks after Sunset obtained a mortgage of $85,000 on the building), Dave Beck and Sunset executed a "lease" which provided, in part, as follows:

1. That in consideration of the covenants and agreements of the Lessee hereinafter set forth and of the sum of $800.00 now paid to the Lessor by the Lessee, the said Lessor does by these presents lease and demise unto the said Lessee that certain office building and warehouse designated and known as No. 4912 14th N.W., Seattle, Washington, being situated upon Lots 1, 2 and 3, Block 162, of Gilman Park, and the vacated South 23 feet of West 50th Street adjacent to said Lot 1, an Addition to the City of Seattle, Washington, for a period of ten years from November 15, 1960, through November 14, 1970, inclusive, for the rent or sum of $120,000.00, lawful money of the United States

of America, payable in advance on the 15th day of each and every calendar month during the full term of this lease in monthly installments of $800.00 per month from November 15, 1960, to November 15, 1965, and $1,200.00 per month from November 15, 1965, to November 14, 1970.

\* \* \* \* \* \* \*

3. That the Lessee has examined the above described premises and accepts said premises and fixtures in their present condition, and finds the same to be in good repair, and hereby covenants and agrees to keep all thereof in good repair, including lot surfaces, fills, bulkheads and drainage system. Lessee further agrees to make all necessary repairs of whatsoever nature to the same, except, however, repairs to the structural bearing parts of the building, the roof, exterior walls and foundation, and further agrees to deliver up all keys belonging to said premises to the Lessor or Lessor's agent at the expiration of this lease.

4. That the Lessee covenants and agrees to pay all charges for light, heat, water, and any increase in real estate taxes over those levied in 1960.

5. That the said Lessee shall hold harmless the Lessor and Lessor's agents from all damages of every kind and nature whatsoever that may be claimed or accrue by reason of any accident in or about the leased premises or from the Lessee's use or occupation of the leased premises and areas adjacent thereto or caused by the acts or neglect of the Lessee or any agent of the Lessee. \* \* \*

Beck reported the consummation of the above transaction in his separate Federal income tax return filed for 1960 in the following manner:

1960 NonReportable Capital Gain

During the year 1960 taxpayer received *for his shares* in Sunset Distributors, Inc. land and building located at 4912 14th N.W., Seattle Washington. [Emphasis added.]

Since the existing mortgage against the land and building is in the same amount as the fair market value of the land and building, legal counsel advises us that no income on the transaction is reportable at this time.

Taxpayer will realize capital gain income as the above mortgage is liquidated by Sunset Distributors, Inc.

Beck did not in fact at any time own any shares of stock in Sunset Distributors, Inc.

(h) *Automobile expenses.*—On their 1959 returns, petitioners deducted $2,263.64 as "travel expenses" under "other deductions." Respondent disallowed this deduction.

On their 1960 and 1961 returns, petitioners deducted $2,173.33 and $2,104.67 of auto expense, representing one-half of the total cash expenses of two cars and depreciation on one car as business expense. Respondent disallowed these deductions for failure to furnish evidence that "these amounts were expended for such purpose or that it was either ordinary and necessary in the operation of any trade or business."

(i) *Estimated taxes paid by petitioners.*—Dave and Dorothy Beck

declared and paid estimated taxes in the following amounts for the taxable years shown below:

| Year | Declaration of estimated taxes | Taxpayer |
|---|---|---|
| 1945 | $1,050.63 | Dave Beck. |
|  | 2,895.24 | Dorothy Beck. |
| 1946 | 743.67 | Dave Beck. |
|  | ---------- | Dorothy Beck. |
| 1947 | 408.47 | Dave Beck. |
|  | 408.46 | Dorothy Beck. |
| 1948 | 1,400.00 | Dave and Dorothy Beck. |
| 1949 | 21,000.00 | Dave and Dorothy Beck. |
| 1950 | 14,340.60 | Dave and Dorothy Beck. |
| 1951 | 14,748.98 | Dave and Dorothy Beck. |
| 1952 | 14,760.96 | Dave and Dorothy Beck. |

The notices of deficiency herein contain a 5-page net worth schedule showing respondent's computation of the amount of increases in net worth for the taxable years 1943 through 1953, inclusive. This net worth statement (Exh. A–1) contains, *inter alia*, approximately 110 items of assets, 4 items of gifts, 8 items of liabilities, 54 items of personal expenditures, and 16 items of nontaxable receipts. Virtually all of these items are either stipulated, conceded, or uncontested. Findings of fact with respect to the disputed items are set forth in the order in which they appear on the aforementioned net worth statement as follows:

(1) *Cash on hand* (*item A–1*).—Respondent, in his net worth statement, shows a total of cash (including cash on hand, cash in transit, and cash in six accounts in the Seattle-First National Bank) in the aggregate amount of $2,331.04 as of the beginning of the net worth period, December 31, 1942. For the period ended December 31, 1953, respondent shows cash in the total amount of $40,547.90 and included in this total amount is "cash on hand" in the sum of $15,953.10 which is the only cash item in controversy.

It is stipulated that the amount of $15,953.10 is evidenced by a check in the amount of $2,500 from the bank account of the B & B Investment Co., a partnership in which Beck was a partner, under date of December 29, 1953. The amount of $12,953.10 was obtained from a Seattle-First National Bank draft (No. 76–1394) dated October 15, 1953, payable to Beck which was cashed on December 28, 1953. The remaining $500 of the $15,953.10 amount is evidenced by a photocopy of the check of William S. Yorozu dated December 18, 1953, which cleared the bank on January 5, 1954. All of these checks and the amounts were stipulated to in the criminal trial and in this case.

In August 1953, Beck purchased a home in Maryland and shortly

thereafter sold one-half of the interest therein to Nathan Shefferman who was a public relations and labor relations consultant located in Chicago, Ill., and who was a friend of petitioner. Shefferman gave Beck a check for $14,500 which he then caused to have converted to a bank draft at the Seattle-First National Bank and subsequently, as reflected on the records of the bank, this bank draft was turned in for two bank drafts, one for $1,000 and the other for $13,500. The $1,000 was sent to William T. Mullenholtz, assistant to the general secretary-treasurer of the International Union since 1937 and controller since 1955, and the other was later cashed and a bank draft (No. 76–1394) for $12,953.10 was obtained by Beck. The $12,953.10 draft was cashed on December 28, 1953. The deposit slip which showed a deposit of $14,500 on January 13, 1954, referred to this amount as coming from Shefferman.

(2) *Lazy Valley Ranch, Inc. (item B–15).*—Respondent, in his net worth schedule, set forth the respective balances of an account receivable owing to Beck from Lazy Valley Ranch, Inc., at December 31, 1951, December 31, 1952, and December 31, 1953, in the respective amounts of $22,200, $13,105.72, and $9,637.55.

Petitioner and Alexander Grinstein purchased some property known as the Lazy Valley Ranch which consisted of about 640 acres. This property was leased to a corporation, the Lazy Valley Ranch, Inc., hereinafter sometimes called the ranch, which was owned by Dave Beck, Jr., and others. The account receivable reflected as item B–15 represents funds advanced by petitioner to the corporation for operating expenses of the ranch. The dispute herein involves three deposits totaling $4,000 to the bank account of Lazy Valley Ranch, Inc., which respondent included in the balance of the account receivable for the year ended December 31, 1953. Petitioner concedes only to an ending balance for this year of $5,637.55.

The evidence discloses that $22,200 was expended by petitioner for the ranch. Of this amount, $13,094 was repaid to him by the corporation and deposited to his B & B Investment bank account during 1952. When this latter amount ($13,094.28) is subtracted from the $22,200, there remains a balance of $9,105.72 in 1953. In addition thereto, there was deposited to the ranch account at the Seattle-First National Bank a total of $4,000 in cash as follows:

| Date | Amount |
|---|---|
| May 12, 1952 | $1,000 |
| June 6, 1952 | 2,500 |
| June 14, 1952 | 500 |

The photostatic copies of the bank statements of the ranch account for this period reflect these three deposits as being loans from Beck and on two occasions, the name "Beck" was scratched out. Respondent

included this $4,000 in the balance of the account receivable for the year ended December 31, 1953.

With respect to the account receivable balance for December 31, 1953, owing from the ranch, the amount of $9,637.55 shown on the net worth schedule consists of the balance at the end of 1952, less a payment made to Beck in 1953 which was a check dated April 13, 1953, in the amount of $3,468.17 from the Fulton Commission Co. This check was deposited to Beck's B & B Investment bank account. An additional amount of $68.30 in cash was received by Beck in 1953. The account receivable balance for the year ended December 31, 1953, in the amount of $9,637.55 was computed by deducting the payment to Beck in the amount of $3,468.17 from the beginning balance of $13,-105.72. Therefore, the net worth statement did not reflect the cash payment and is overstated in the amount of $68.30 for the taxable year

(3) *Sick's Seattle Brewing & Malting Co. (item C-19).*—Respondent, in his net worth schedule, shows the Becks as having had actual or constructive ownership of capital stock in Sick's Seattle Brewing and Malting Co., hereinafter sometimes called Sick's, at the end of each of the years 1942 through 1945 in the amount of $5,314.40; 1946 through 1947 in the amount of $4,714.40; and 1948 through 1953, inclusive in the amount of $4,244.40.

In about 1935, Beck purchased 100 shares of Sick's stock for $2,000 in the name of his sister, Reta Henne. In 1937, this stock was reissued in the name of D. W. Marshall and shortly thereafter a stock dividend of 15 to 1 was declared. D. W. Marshall was a nominee of Beck and an employee of the Teamsters Union. On September 4, 1940, Beck purchased 762 shares at $1.20 a share for a total of $914.40 in the name of D. W. Marshall and an additional 2,000 shares on November 2, 1940, at a cost of $2,400. At the end of 1942, Beck had therefore invested $5,314.40 in Sick's stock.

Some additional shares in Sick's were also inherited by Dorothy Beck from one Minnie Leschandler in 1948. The dividends which were received thereon by Dorothy Beck in 1948 and 1949 were not reported in the Becks' tax returns for those years.

The stock certificates in Sick's which had been issued to Marshall were upon issuance to him turned over by the latter to Beck. In 1946 or 1947, Marshall at Beck's direction signed over the certificates, part of them to Reta Henne, 500 shares to Dave Beck, Jr., and the balance were signed in blank by Marshall and returned to Beck.

After Marshall had signed over the Sick's stock certificates to Beck, the former continued to receive in the mail dividend checks on the stock, all of which checks were endorsed over to Dave Beck.

Petitioner did not report any dividends from Sick's stock in his returns for the taxable years in which he owned the stock.

In 1948, Beck sold 2,762 shares of Sick's stock which was still being carried in the name of D. W. Marshall in the brokerage account for $10,913.50. A check in this amount dated January 16, 1948, drawn on the account of Foster and Marshall and payable to Marshall was issued by the brokerage firm. Beck wrote Marshall's endorsement on the check and then endorsed the check over to one Irving Levine in payment for stock in K & L Distributors, Inc., which stock was issued in the name of Dorothy Beck.

As was the case with respect to the dividends received by the Becks on the Sick's stock, they failed to report any of the gain which they realized in 1948 upon the sale of this stock.

Beck did not include the ownership of the Sick's stock in the net worth statement filed with the Internal Revenue Service with regard to the prior audits.

Beck's sister, Reta Henne, also operated as a nominee for Beck with respect to the ownership of other stocks. The disposition and income from this stock was reported by Beck on his tax return.

(4) *Improvements—Lazy Valley Ranch (item E-16).*—Respondent, in his net worth schedule, determined that petitioners had made improvements (land clearing) to the Lazy Valley Ranch during 1950, 1951, and 1952 totaling $14,192.87. Petitioners, on brief, concede that they paid for improvements during these years on the aggregate amount of $8,517.27 but deny that they made the balance ($5,675.60) of such payments for improvements to the ranch.

The Lazy Valley Ranch property was owned by petitioner and one Alexander Grinstein. Dave Beck, Jr., was president, Norman Gessert (Dorothy Beck's cousin) was vice president, and Carl J. Baker was secretary-treasurer of the corporation. Lazy Valley Ranch, Inc., engaged in cattle-raising operations on this property but they had nothing to do with the ownership or improvement of the ranch property itself.

(5) *Sheridan Beach construction (item E-21).*—Respondent, in his net worth schedule under the title "Real Estate," set forth the cost of improvements to petitioners' real estate at Sheridan Beach No. 2, Seattle Wash., for the year ended December 31, 1953, as follows:

| | |
|---|---|
| John Lindsay, Jr | $94, 508. 78 |
| Einar Rasmussen | 11, 487. 55 |
| Lindsay Construction Co | 59, 649. 53 |
| Total | 165, 645. 86 |

The property at Sheridan Beach included 10 residences owned by Richard Klinge, Albert Irvine, Robert Graham, Norman Gessert, Mc-

Evoy, Stackpool, Conley, Krieger, and petitioners. All of these individuals were union employees with the exception of Conley. Some of these homes were built by John Lindsay and some by Einar Rasmussen.

During the years involved, John Lindsay, Jr., did construction for the union entities connected with the Teamsters in addition to Beck's residence. No formal contracts were entered into for the construction work performed for these unions.

The Becks established a nominee account in 1948 under the name of John Lindsay Construction Co. at the Seaboard Branch of the Seattle-First National Bank, Seattle, Wash. The purpose of this account was to finance the building of homes for the Becks, Klinge, Irvine, Graham, and Gessert. The net amount expended by the Becks through this account, plus $13,253.07 which was paid direct to Sears, Roebuck & Co. for construction materials, totaled $67,422.50 as of December 31, 1948; $73,121.07 as of December 31, 1949; and $59,649.53 as of the end of the years 1950, 1951, 1952, and 1953, respectively.

The Becks authorized payment for and paid John Lindsay, Jr., to make certain additions to their home in Sheridan Beach No. 2. Amounts expended by the Becks for this purpose as of the end of the taxable years 1950 through 1953 as follows:

| Dec. 31— | Amount |
|---|---|
| 1950 | $11,742.78 |
| 1951 | 87,658.78 |
| 1952 | 94,508.78 |
| 1953 | 94,508.78 |

The payment of the aforementioned amounts during each of the taxable years involved were made as follows:

1950 ADDITIONS

| | | |
|---|---|---|
| Sept. 8, 1950 | | $3,000.00 |
| Oct. 19, 1950 | | 5,000.00 |
| Source of payments, Joint Council Building Assn. | | |
| John Lindsay account sheet headed June 15, 1950: | | |
| June 22, 1950, payment to Chamberlin | $139.00 | |
| June 22, 1950, payment to Baker & Markham | 912.50 | 1,051.50 |
| | | |
| Source of payments, Joint Council Building Assn. | | |
| June 15, 1950, payment to Baker & Markham | 955.00 | |
| June 15, 1950, payment to R. A. Anderson | 883.34 | |
| Balance on account to Norman Gessert | 393.95 | 2,232.29 |

This was paid by part of a check for $11,013.05 to John Lindsay from Joint Council Building Assn. The balance of the $11,013.05 was used to pay Einar Rasmussen Construction and for improvements to parking lot owned by Beck. These items are shown as other items in the net worth.

June 30, 1950, payments by Lindsay to:

| | | |
|---|---|---|
| R. A. Anderson | $319. 44 | |
| Unidentified payment | 139. 55 | $458. 99 |

Lindsay received a check from the Public Relations Division Special Account of Joint Council No. 42, Los Angeles, Calif., for $3,303.21. The balance of the $3,303.21 was paid on other construction bills of Beck.

Balance Dec. 31, 1950 ........................... 11, 742. 78

### 1951 ADDITIONS

Statements of John Lindsay to Beck showing construction costs
to Beck per final statement #7 .......................... $44, 076. 00

Pencil draft of John Lindsay starting on Jan. 30, 1948, through Dec. 4, 1952, listing payments received for account of Teamsters and Beck. Receipts for Beck in 1951 not listed in statement above as follows:

| | | |
|---|---|---|
| July 11, 1951 | $15, 000. 00 | |
| Sept. 10, 1951 | 7, 500. 00 | |
| Nov. 7, 1951 | 7, 500. 00 | |
| Dec. 15, 1951 | 1, 840. 00 | 31, 840. 00 |

Total 1951 additions .......................... 75, 916. 00

Balance Dec. 31, 1951 .......................... 87, 658. 78

### 1952 ADDITIONS

| | | |
|---|---|---|
| Statement of John Lindsay to Beck dated Nov. 1, 1952, showing additional cost from Jan. 1, 1952, to Nov. 1, 1952 | $5, 000. 00 | |
| Pencil draft of John Lindsay listing receipt on Apr. 29, 1952 | 4, 000. 00 | |
| Less Lindsay's payment to Prentice Nursery on behalf of Beck | (3, 750. 00) | |
| Receipt of June 16, 1952, of $1,600, Aurora Tile Co. invoice paid June 20, 1952, by Lindsay check No. 2508 | 1, 600. 00 | |

Total 1952 additions .......................... 6, 850. 00

Balance Dec. 31, 1952 .......................... 94, 508. 78

### EINAR RASMUSSEN—1949 THROUGH 1953

| | |
|---|---|
| Payments Beck made to Rasmussen for construction work on four houses during 1949 | $28, 173. 79 |
| Less amount allocated to land | (8, 500. 00) |

| | |
|---|---|
| Balance Dec. 31, 1949 | 19, 673. 79 |
| Add 1950 payments | 33, 970. 57 |

| | |
|---|---|
| Total | 53, 644. 36 |
| Less cost of house sold to Stewart Kreiger | (16, 646. 25) |

| | | |
|---|---|---|
| Balance Dec. 31, 1950 | | 36, 998. 11 |
| Less cost of house sold to McEvoy 1951 | $16, 990. 73 | |
| Less cost of house sold to McEvoy 1951 | 8, 519. 83 | (25, 510. 56) |

Balance Dec. 31, 1951, 1952, and 1953 .......................... 11, 487. 55

LINDSAY CONSTRUCTION Co.—1948 THROUGH 1953

| | | |
|---|---:|---:|
| Expenditures per bank account 1948 | | $67,219.45 |
| Add payment to Sears, Roebuck & Co., by Beck | | 13,253.07 |
| Total | | 80,472.50 |
| Less real estate purchases | | (5,550.00) |
| Less payment by Norman Gessert | | (7,500.00) |
| Asset balance Dec. 31, 1948 | | 67,422.50 |
| 1949 expenditures | $49,598.57 | |
| Less sale of residence | (42,000.00) | |
| Less real estate purchase | (1,900.00) | 5,698.57 |
| Asset balance Dec. 31, 1949 | | 73,121.07 |
| 1950 expenditures | 146.45 | |
| Less real estate mortgages: | | |
| Richard Klinge | (4,751.51) | |
| Albert Irvine | (4,872.03) | |
| Robert Graham | (3,994.45) | (13,471.54) |
| Asset balance Dec. 31, 1950, 1951, 1952, and 1953 | | 59,649.53 |

(6) *Miscellaneous assets* (*item H*).—Petitioners began to build their residence in Seattle, Wash. (16749 Shore Drive Northeast), at Sheridan Beach No. 2 in the year 1948. The Becks' residence was located in an area known as the Sheridan Beach "compound" which after construction included his residence and nine other houses. The owners of eight of these other homes included Klinge, Irvine, Graham, Gessert, McEvoy, Stackpool, Conley, and Krieger, all of whom were "union employees," except Conley. The Becks' home and four others in the compound were built by Raymond Leheney, a contractor who earlier had built the Teamsters Building in Seattle.

Leheney was also the director of the public relations division of Joint Council No. 42. Leheney and Beck set up an account entitled "Special Accounts of the Public Relations Division of Joint Council No. 42" in order to receive money that was disbursed by Joint Council No. 42 to this special account. Payments to Leheney for his contracting work on the homes he built in the compound were charged on the union books as new construction and repairs.

During the years 1949 through 1953, the Becks made extensive and costly improvements to their residence to such an extent that the home was virtually doubled in size. Their residence and grounds included a swimming pool, bathhouses, and a greenhouse. They also had a home movie projector in a "little theatre" within the house which was used

for entertaining personal friends, including the "immediate neighbors in the community," and upon occasion, labor leaders. Petitioners could show movies to about 50 to 60 people at a time and their dining room likewise would accommodate a similar number.

Respondent, in his net worth schedule, included a classification called "Miscellaneous Assets" with 24 separate items. All of these items (except H-24) in this category in the aggregate amount of $59,951.53 was expended by or on behalf of petitioners for the improvements of their property in Sheridan Beach Addition No. 2. Petitioners agree to the correctness of the amount relating to each item involved (H-1 through H-23), the named payee, and the nature of the expenditure but do not agree that the entire amount of the listed sum should be added to petitioners' net worth or personal expenditures.

For clarity and convenience of discussion at this point, we set forth additional findings of fact relating to the fair rental value of petitioners' residence in Sheridan Beach although our opinion with respect to this issue has no direct bearing on the net worth computation.

In 1955, the Becks sold their home to the International Union for $163,215. In their Federal income tax return filed for that year, the Becks disclosed that the home had a cost basis to them of $157,252.85.

Petitioners continued to live in the home after selling it to the union throughout the years 1955 to 1961, inclusive. During the years 1958 and 1959, the Becks paid no money to the union as rental on the home. In their Federal income tax returns filed for the year 1958, the Becks added to their reported income the amount of $600 and represented that amount as the value to them of the living quarters for the first 3 months of that year.[5] In their returns filed for the year 1959, the Becks attributed nothing (as income) to themselves for the value of the rent-free living quarters and in his return for that year, Beck explained that he regarded the living quarters as a "gift" to him by the union.

During the years 1960 and 1961, the Becks paid $400 per month to the International Union as rental on the home. In the Federal income tax returns filed by the Becks for the years 1960 and 1961, the Becks attributed nothing to themselves as income for the fair rental value to them of the living quarters.

The fair rental value to the Becks of this home in each of the years subsequent to its sale to the union while they lived there was $1,000 per month.

(7) *Assets acquired through Shefferman (item H-24).*—In his net worth statement, respondent included under "Miscellaneous Assets,"

---

[5] In the return filed by Dave Beck, it was explained that since he was not in the employ of the International Union for the last 9 months of 1958, he believed that the living quarters were a "gift" to him.

item H–24, "Assets acquired through Shefferman" cumulative total amounts for various personal miscellaneous assets as follows:

| Dec. 31— | Amount | Dec. 31— | Amount |
|---|---|---|---|
| 1948 | $1,014.48 | 1951 | $36,482.12 |
| 1949 | 12,842.22 | 1952 | 44,351.90 |
| 1950 | 22,823.18 | 1953 | 54,240.46 |

During the taxable years 1948 through 1953, inclusive, Beck and others purchased many items of merchandise through Nathan Shefferman of Chicago, Ill., who was his friend. The merchandise was ordered by Beck from Shefferman and the latter would buy the goods from various suppliers. Thereafter, Shefferman would issue his check to the suppliers and the goods would be delivered to Beck or others designated by him.

Shefferman was a public relations and labor relations consultant located in Chicago, Ill. Some years prior to 1948, he had been an employee of Sears, Roebuck & Co. doing public relations and labor relations work. During 1948 through 1953, inclusive, he made many purchases of merchandise for people generally at a discount. The items purchased consisted of items which people may need in their homes.

During the taxable years involved herein, Shefferman's bookkeeper, Florence Ouska, wrote his checks for merchandise bought for Beck and noted on the check stubs information pertaining to the particular disbursement. These records also reflected who paid for the various items purchased by Shefferman. About three or four times a year, Ouska would send a bill to Beck and at the latter's direction, a check drawn on the funds of various union entities with which Beck was affiliated would be mailed to Shefferman in payment thereof. The data on Shefferman's check stubs was summarized by Revenue Agent Garrett in Exhibit BU which included a list of each item purchased and a correlative check number. In the preparation of this summary, Garrett eliminated certain items which Ouska concluded had not been purchased for Beck's personal use.

(8) *Gifts* (*item J–2*).—During the years 1948 through 1953, Dave Beck purchased many items through Nathan Shefferman. The latter's bookkeeper, Florence Ouska, noted on his check stubs the name of the person for whom the items were purchased. Their records also reflected who paid for the various items. The record shows that certain of the purchases were intended as gifts from petitioner to the recipients of the purchases. It is stipulated that Dave Beck, Jr., bought various items and appliances for his friends. Shefferman paid for these items and was reimbursed by Dave Beck, Sr. Dave Beck, Jr., collected the cost thereof from his friends and used it or put it in his own bank account.

In his computation of petitioners' net worth for the taxable years under review, respondent added "nondeductible expenditures" which included (J–1) income taxes paid; (J–2) gifts; and (J–3) personal expenditures. There is no dispute as to the income taxes paid. With respect to (J–2) gifts, respondent determined that certain items were purchased through Nathan Shefferman by petitioner for Dave Beck, Jr., and others, and that the cost thereof constituted gifts made by petitioner and hence includable in his net worth. Petitioners stipulated in Supplemental Stipulation of Facts No. 7 that the items classified as (J–1) income taxes paid, J(2)(a), gifts to Al Levine, J(2)(b), gifts to Dave Beck, Jr., and J(2)(c), gifts to Mrs. A. Greer, are "correctly stated." Petitioners, on brief, aver that these items, J(2)(a), J(2)(b), and J(2)(c), are conceded, but not item J(2)(d), entitled "Schedule" which remains in dispute. In the net worth schedule, the item "Schedule" shows the following amounts of nondeductible expenditures:

| Dec. 31— | Amount | Dec. 31— | Amount |
|---|---|---|---|
| 1948 | $145.82 | 1951 | $1,393.82 |
| 1949 | 2,619.38 | 1952 | 3,305.16 |
| 1950 | 1,815.20 | 1953 | 3,195.99 |

For the following years, checks were drawn on the account of Shefferman for merchandise and his bookkeeper noted on the check stub that the merchandise was purchased for the individuals indicated below:

**1948**

| | |
|---|---|
| Dave Beck, Jr. | $145.82 |

**1949**

| | |
|---|---|
| Dave Beck, Jr. (9 checks) | 2,339.95 |
| W. A. Smith | 206.53 |
| Reta Henne | 72.90 |
| | 2,619.38 |

**1950**

| | |
|---|---|
| Dave Beck, Jr. (6 checks) | 995.65 |
| Dave Beck (2 checks) | 227.00 |
| Robert Foster | 184.69 |
| Stacy Barton | 184.69 |
| Lilla McClelland | 143.67 |
| Lt. Denson | 79.50 |
| | 1,815.20 |

**1951**

| | |
|---|---|
| Dave Beck, Jr. (8 checks) | $1,393.82 |

**1952**

| | |
|---|---|
| Dave Beck, Jr. (3 checks) | 1,041.56 |
| Dave Beck (8 checks) | 1,877.75 |
| Reta Henne | 201.60 |
| Mrs. Anna Nielsen | 184.25 |
| | 3,305.16 |

**1953**

| | |
|---|---|
| Dave Beck, Jr. (18 checks) | 3,133.54 |
| Mary Beck | 230.14 |
| | 3,363.68 |

The total for 1953 is incorrectly set forth in the stipulation and respondent's net worth schedule as $3,195.99.

Petitioners concede that of the checks mentioned hereinabove ($12,643.06), the following are nondeductible gifts:

| | | |
|---|---|---|
| 1949 | W. A. Smith | $206.53 |
| 1950 | Lilla McClelland | 143.67 |

Petitioners deny that the balance of items noted above for the years 1948 through 1953, inclusive, were nondeductible gifts made by Dave Beck.

(9) *Nondeductible expenditures (item J-3).*—With respect to all items classified as Personal Expenditures under item J-3 of the net worth statement, Supplemental Stipulation of Facts No. 1, at paragraph 2(b), states that with the exception of items J(3) (bb), classified as "Boarding of dogs by Woodrow Madsen, 1947 through 1953" and J(3) (bc), classified as "Estimated living expenses, 1943 through 1949, inclusive," petitioner agrees to the correctness of the amount, the named payee, and the nature of the expenditure, but does not agree that the entire amount of the listed sum should be added to petitioners' net worth or personal expenditures. However, in Supplemental Stipulation of Facts No. 7, petitioners conceded that the items below were expended by or on behalf of petitioner for the following purposes:

(a) Personal nondeductible items:

| Item | | Item | |
|---|---|---|---|
| J(3) (m) | I. Magnin & Co. | J(3) (aj) | Taxes paid for others |
| J(3) (p) | Occidental Life Insurance Co. | J(3) (al) | Preston, Thorgrimson & Horowitz |
| J(3) (r) | Providence Hospital | J(3) (an) | Nondeductible loss on car |
| J(3) (t) | Saks Fifth Avenue | J(3) (ar) | Sheridan Beach Community Club |
| J(3) (ab) | Dr. Geo. Winston | | |
| J(3) (ac) | Dr. Templeton and Dr. Addington | J(3) (as) | Fred Wettrick, attorney |
| | | J(3) (az) | Weber & Hellbrones |
| J(3) (ag) | Commissioner of Public Lands | J(3) (ba) | Dorothy E. Beck's account |
| J(3) (ah) | Rubenstein's Pharmacy | | |

(b) For use in or in connection with petitioner's residence in Sheridan Beach Addition No. 2:

| Item | |
|---|---|
| J(3) (a) | Domestic help |
| J(3) (b) | Altec Service Corp.—service and parts on motion picture equipment |
| J(3) (d) | Dohrman Hotel Supply Co.—kitchen equipment and dishes |
| J(3) (e) | George S. Bush & Co.—import duty on silver-plated tableware |
| J(3) (f) | Elmer Coffman—yard maintenance |
| J(3) (g) | Cyclone Fence—wire fence around property |
| J(3) (l) | Lake City Fuel—heating oil |
| J(3) (n) | Victor Mix, d/b/a Campus Nursery—garden supplies |
| J(3) (o) | George C. Newell Co.—insurance |
| J(3) (q) | Occidental Sheel Metal Co.—5 trays |
| J(3) (u) | Sprague Spray—yard maintenance |
| J(3) (v) | Star Machinery—equipment rental |
| J(3) (y) | Sunde & d'Evers Co.—canvas patio coverings |
| J(3) (z) | Tesack-Peters Co.—groceries |
| J(3) (ae) | T. Yorozu Gardening—yard maintenance |
| J(3) (af) | Des Moines Way Nursery—yard maintenance |

*Item*

| | |
|---|---|
| J (3) (ai) ___ | Eckart Bros.—plumbing and heating merchandise |
| J (3) (ak) __ | Seattle Tent & Awning—patio awning |
| J (3) (ao) __. | Social Security Taxes on domestic help |
| J (3) (ap) __ | H. N. Clifton—cow manure for yard |
| J (3) (aq) __. | Roy Cleaners—rug cleaning |
| J (3) (at) ___ | S.S. Auto Freight—shipping charges |
| J (3) (au) __ | City of Seattle Light—electricity expense |
| J (3) (bd) __. | Insurance on home |

### (c) For men's clothing:

*Item*

| | | | |
|---|---|---|---|
| J (3) (c) ___. | Bender and Kohlstad | J (3) (w) ___ | A. Sulka & Co. |
| J (3) (h) ___. | Ford Tailor and Importer | J (3) (x) ___ | Stone & Rothenberg |
| J (3) (j) ___. | French-Shriner & Urner | J (3) (ax) __ | Karoll's |
| J (3) (k) ___ | M. Jackson & Sons | J (3) (ay) __ | A. Star Bests |

### (d) Miscellaneous:

*Item*

J (3) (i) _____ Frederick & Nelson—Petitioners concede all amounts to be nondeductible personal expenditures except for the following purchases:

| | |
|---|---|
| December 1950—Candy_____ | $213. 21 |
| December 1951—15 boxes candy_____ | 115. 88 |
| July 1952—7 swimsuits_____ | 115. 00 |
| July 1952—14 swimsuits_____ | 74. 62 |

J (3) (s) _____ Ernie Rose Sports Shop—Sports equipment, including baseball gloves, baseballs, softballs, footballs, jackets, striking bag, and basketballs.

J (3) (aa) ____ William O. McKay Co.—Automobile repairs

J (3) (ad) ____ City Electric & Fixture Co.—Petitioners concede that the following are nondeductible personal expenditures:

| | |
|---|---|
| 1950_____ | $8. 19 |
| 1952_____ | 14. 53 |
| 1953_____ | 7. 78 |

In 1952, the following was spent on petitioners' residence:

| | | |
|---|---|---|
| 7/17/52 | Motor_____ | $90. 65 |
| 8/4/52 | Kitchen_____ | 126. 26 |
| 8/22/52 | Floodlight_____ | 554. 60 |

J (3) (am) ___ Christmas gifts to the following:

| Name | 1952 | 1953 |
|---|---|---|
| Maxine Graham_____ | $25 | $25 |
| Virginia Stackpool_____ | 25 | 25 |
| Rita May McEvoy_____ | 25 | 25 |
| Doris Wampold_____ | 25 | 25 |
| Sarah Short_____ | 25 | 25 |
| Al Irvine_____ | 100 | 100 |

J (3) (aw) ____ Sears Roebuck—This item is conceded by respondent.

J (3) (be) ____ Prior years expenses allowed as abandonment loss—This item is agreed to be correct.

(10) *Boarding of dogs by Woodrow Madsen (item J–3 (bb)).*—In his net worth statement under the classification of nondeductible per-

sonal expenditures, respondent included an item "Boarding of dogs by Woodrow Madsen" reflecting the following:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1947 | $100 | 1951 | $300 |
| 1948 | 1,200 | 1952 | 300 |
| 1949 | 1,200 | 1953 | 100 |
| 1950 | 1,050 | | |

Petitioners owned four dogs during the aforementioned years. Beck also owned a building in Seattle, Wash., which he leased on December 1, 1947, to Woodrow Madsen, a professional dog trainer, for use as a dog kennel business. The lease between petitioners and Madsen provided:

> The lessees agree to pay the lessor the sum of $100 per month in advance on the first of each and every month commencing December 1, 1947, and in addition to the rental herein specified as additional consideration for this lease. the lessees agree to keep and board four dogs for the lessors during the entire term of this lease or any renewal thereof.

The going rate which Madsen charged for boarding dogs was $25 a month per dog. Computed at this rate, the amount of Madsen's charges for boarding petitioners' dogs would have totaled the amounts reflected in respondent's net worth statement pertaining to this item. Madsen paid a rental of $100 per month by check to Beck starting December 1, 1947, until April 1, 1953.

(11) *Estimated living expenses* (*item J–3(bc)*).—In his net worth statement, respondent included under nondeductible personal expenditures the item "other living expenses—estimated" for the years 1943 through 1949, inclusive, as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1943 | $10,000.00 | 1947 | $10,000.00 |
| 1944 | 10,919.86 | 1948 | 10,000.00 |
| 1945 | 10,000.00 | 1949 | 10,000.00 |
| 1946 | 10,000.00 | | |

For the years 1950 through 1953, the personal expenses were as follows:

| Year | Amount |
|---|---|
| 1950 | $24,433.52 |
| 1951 | 23,906.95 |
| 1952 | 32,747.30 |
| 1953 | 23,699.06 |
| Total | 104,786.83 |

The average living expenses during the period 1950 through 1953 were $26,196.70 per year.

Petitioners concede that their estimated living expense was at least $8,000 per year for the years 1943 through 1949.

*Specific Items of Income Received by Petitioners Omitted From Their Federal Income Tax Returns and Sources Thereof*

In addition to the reconstruction of petitioners' income by the net worth plus expenditures method for the taxable years 1943 through 1953, inclusive, respondent introduced evidence, based mainly on third-party records, showing specific items of income received by petitioners which were omitted from their Federal income tax returns and the sources thereof. These items of income are as follows:

Beck was paid regular monthly expense allowances by the International Brotherhood of Teamsters which included hotel, incidental, and other allowances for the years 1943 through 1953. The checks received for these allowances were made payable to Dave Beck and were deposited in the bank account of Dorothy Beck. The yearly totals of these regular allowances are shown below:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1943 | $5,669.98 | 1949 | $6,964.01 |
| 1944 | 5,779.56 | 1950 | 7,001.06 |
| 1945 | 5,855.51 | 1951 | 7,376.80 |
| 1946 | 6,372.93 | 1952 | 7,899.25 |
| 1947 | 6,182.43 | 1953 | 11,254.58 |
| 1948 | 6,010.32 | | |

In addition to the salary which he received from the International Union, Beck received a per diem allowance which was paid to him whether or not he was in travel status. This per diem allowance, when paid by the International Union to Beck, was deposited along with Beck's salary in Dorothy Beck's bank account. The Becks did not report the receipt of any of these per diem allowances in their Federal income tax returns filed for any of the years 1943 to 1953, inclusive.

Likewise a hotel allowance which Beck received from the International Union was paid to him regularly and automatically whenever he was not in Seattle. This practice was followed even when Beck was renting an apartment in Washington, D.C., during his stay there and the International Union was paying the rent on the apartment. These hotel allowances, when paid by the International Union to Beck, were deposited along with his salary in Dorothy Beck's bank account. The Becks did not report the receipt of any portion of these hotel allowances in their Federal income tax returns filed for the years 1943 to 1953, inclusive.

John F. English (who was general secretary-treasurer of the International Union), William Mullenholz (who was comptroller of the International Union and was formerly the assistant to the general secretary-treasurer of the union), Tobin (who was the general

president of the International Union when Beck was executive vice president), and members of the executive board of that union were all aware during the years in issue that Beck was receiving expense allowances from the union even though the union was paying his actual business expenses, such as hotel bills, directly to the hotel or to the party providing the goods or services. No staff member other than Beck was accorded such a privilege.

Petitioner was paid additional incidental expense allowances as shown below:

(a) Petitioner was paid $5,000 during the year 1949 by the International Brotherhood of Teamsters for a trip to Europe. This payment was in the form of a check endorsed by Dave Beck and deposited in his bank account. Details of this item have been set forth *supra*.

(b) Petitioner was paid $3,001.20 during the year 1953 by the International Brotherhood of Teamsters.

(c) Petitioner received additional specific trip expense allowance from the Union Label Trades Department of the American Federation of Labor in the following total amounts for the years indicated:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1946 | $652. 61 | 1949 | $2, 975. 09 |
| 1947 | 1, 180. 20 | 1950 | 1, 185. 98 |
| 1948 | 1, 101. 48 | 1951 | 541. 71 |

(d) The Western Conference of Teamsters paid petitioner $5,000 during the year 1949 for a trip to Europe. This check was deposited in Beck's personal bank account. Details of this item have been set forth *supra*.

(e) Joint Council No. 28 paid petitioner $750 during the year 1952.

The International Brotherhood of Teamsters paid $278.10 in each of the years 1943 through 1953 as premiums to the Union Labor Life Insurance Co. in behalf of Dave Beck. None of these amounts were reported as income in the Federal income tax returns of petitioners which were filed for those years.

Of the dividends which were received by the Becks on their Sick's Seattle Brewing & Malting Co. stock during the years shown below, the Becks failed to report as income the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1947 | $1, 128. 60 | 1950 | $586. 17 |
| 1948 | 415. 50 | 1951 | 587. 05 |
| 1949 | 648. 50 | 1953 | 288. 05 |

On their 1952 income tax returns, the Becks overstated their dividend income from their Sick's stock by $1,051.79.[6]

---

[6] Since respondent has not made any apparent adjustment for this overstatement of income in his deficiency notice for the taxable year ended Dec. 31, 1952, this item will be adjusted under Rule 50.

In 1948, the Becks sold for $10,913.50, 2,100 shares of Sick's stock for which they had paid $2,720. The Becks failed to report on their 1948 income tax return any of the gain thus realized from the sale. Details of this item have been set forth *supra*.

The Becks received additional rental income from Woodrow Madsen as follows:

| Year | Amount | Year | Amount |
|------|-------:|------|-------:|
| 1947 | $100 | 1951 | $300 |
| 1948 | 1,200 | 1952 | 300 |
| 1949 | 1,200 | 1953 | 100 |
| 1950 | 1,050 | | |

The Becks did not report any of these amounts on their Federal income tax returns filed for the years noted above. Details of this item have also been set forth *supra*.

### $22,000 Received From Nathan Shefferman in 1948

On August 2, 1948, a check was drawn on the account of Nathan W. Shefferman of Chicago, Ill., in the amount of $22,000 in favor of Dave Beck, Sr., which was deposited in the account of Lindsay Construction Co. at the Seaboard Branch of the Seattle-First National Bank, which account was a nominee account of Dave Beck. This check was endorsed "Dave Beck-John Lindsay Construction Company." Several years later, petitioner executed a note in the amount of $22,000 dated April 19, 1951, which states, *inter alia*, "Pay to the order of Nathan Shefferman, Chicago, Illinois, twenty-two thousand and no dollars," and is signed by Dave Beck. The amount of $22,000 was not reported on petitioners' 1948 income tax return.

### Sale of Boxes for Baseball Games

Beck received four complimentary boxes for baseball games played at Sick's Rainier Stadium in each of the years 1950 to 1953, inclusive. He personally sold the use of one of the boxes to James J. Rohan, an officer of Teamsters Local 882, in each of the years 1950 to 1953 for varying amounts. The amount which Beck was paid in 1952 for the use of the box by Rohan in that year was $364. This amount was not reported on the Becks' 1952 income tax return. Beck advised his accountants (Friedman, Lobe & Block) that the $364 was received by him as repayment of a loan which he had made to local 882. That local had in fact never borrowed any money from Beck.

The following payments were made by the Western Conference of Teamsters to third parties for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1946 | $5,000.00 | Payment on Beck's personal debt at the Seaboard Branch of the Seattle-First National Bank. |
| 1949 | 10,458.77 | Reimbursement to John Lindsay for payment of Beck's personal bills. |
| 1950 | 21,715.05 | Reimbursement to John Lindsay for payment of Beck's personal bills and direct payments for Beck's personal clothing bill, insurance bill, and drug bill. |
| 1951 | 16,284.12 | Payment to Lindsay for Beck's personal construction work; and direct payments for Beck's personal drug bill, personal projector service bill, personal automobile; and personal motion picture equipment. |
| 1952 | 9,888.26 | Direct payments for Beck's personal drug bill; personal projector service bill; personal auto repair; personal shoe bill; personal down payment on land; personal payment to Shefferman; personal sports equipment; and a personal automobile. |
| 1953 | 4,339.55 | Direct payments for Beck's personal insurance bills; personal drug bill; personal projector service bill; personal sports equipment; personal azalea plants; personal Saks Fifth Avenue bill; and personal automobile. |

The following payments were made by the Joint Council No. 28 Building Association to third parties for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1944 | $1,125.00 | Payment to Lindsay for alterations to the Becks' personal residence. |
| 1945 | 5,250.00 | Payments to Lindsay for alterations to the Becks' personal residence. |
| 1950 | 21,068.85 | Payments to Lindsay for personal obligations of Beck including fencing, parking lot improvements, and construction at Sheridan Beach. |
| 1951 | 46,840.00 | Payments to Lindsay for personal construction obligation of Beck. |
| 1952 | 56,207.39 | Payments to Lindsay and Eckart Bros. for personal obligations of Beck including Sheridan Beach construction, bulldozing at Lazy Valley Ranch, and nursery and tile work. |

The following payments were made by the Western Conference of Teamsters Radio Fund to third parties for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1950 | $3,832.90 | Payment of interest on Beck's personal loan from the bank and his personal nursery bill. |
| 1951 | 518.75 | Payment of interest on Beck's personal loan from the bank. |
| 1952 | 276.00 | Payment for Beck's personal clothes. |

The following payments were made by the Joint Council No. 28 Legal Fund to third parties for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1948 | $2, 123. 84 | Direct payment for Beck's automobile. |
| 1951 | 2, 120. 15 | Direct payment for Beck's building supplies and bulldozing. |
| 1952 | 1, 298. 65 | Direct payments for Beck's oil and gas lease and awnings. |

The following payment was made by the International Brotherhood of Teamsters to a third party for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1953 | $107. 36 | Direct payment for Beck's personal drug bill. |

The following payment was made by the Washington Teamsters which was a fund maintained by Joint Council No. 28 to a third party for the personal benefit of Beck:

| Year | Amount | Purpose |
|---|---|---|
| 1952 | $2, 870. 00 | Direct payment for bulldozing at Lazy Valley Ranch (which was Beck's property). |

The following amounts were transferred from the Western Conference of Teamsters' bank account to the bank accounts of Beck, Lindsay Construction Co. (a nominee account owned by Beck), and B & B Investment Co. (an account owned by Beck):

| Year | Amount | Bank account name |
|---|---|---|
| 1948 | $3, 258. 26 | Lindsay Construction Co. |
| 1949 | 6, 700. 00 | Lindsay Construction Co. |
| 1950 | 1, 180. 38 | Dave Beck. |
| 1951 | 4, 912. 39 | Dave Beck. |
| 1952 | 15, 000. 00 | B & B Investment Co. |

Beck furnished all the money deposited to the John Lindsay Construction Co. bank account except $7,500 which was furnished by Norman Gessert.

Beck was the sole signator on the bank accounts maintained in the names of Beck and B & B Investment Co.

During the years 1943 to 1952, inclusive, and to February 12, 1953, Beck and Frank Brewster were the signators on the Western Conference of Teamsters bank accounts maintained at the Seattle-First National Bank.

Brewster often signed Western Conference of Teamsters checks in blank and made them available to Beck.

As president of the Western Conference of Teamsters, Beck controlled the funds in its bank accounts. He had the right to do as he wished with the funds of the Western Conference for the benefit of that union and there was never any question raised by the Western Conference in that regard.

During the years 1943 through 1950, Beck and Brewster were the

signators on the Building Association's bank account maintained at the National Bank of Commerce. In 1950, the sum of $1,009 was transferred from the Joint Council No. 28 Building Association's bank account to the personal bank account of Beck. Brewster often signed Building Association checks in blank and made them available to Beck. Beck, as president of the Building Association, along with Brewster, controlled the funds of the Building Association.

During the years 1950 through 1952, Beck and Fred Verschueren were the signators on the Western Conference of Teamsters Radio Fund's bank account. During the year 1951, $525 was transferred from the Western Conference of Teamsters Radio Fund's bank account to the bank account of Beck.

Frank Brewster, who was secretary-treasurer of the Western Conference of Teamsters during the years 1943 through 1953, had no knowledge that the Western Conference of Teamsters had a Radio Fund bank account.

Beck, as president of the Western Conference of Teamsters, controlled the funds in the Radio Fund bank account.

The following amounts were transferred from the Joint Council No. 28 Legal Fund bank account to the bank account of Lindsay Construction Co., Beck, and B & B Investment Co. All of these latter accounts were controlled by petitioner.

| Year | Amount | Bank account name |
|------|--------|-------------------|
| 1948 | $2,580 | Lindsay Construction Co. |
| 1949 | 4,500 | Lindsay Construction Co. |
| 1951 | 7,631 | Dave Beck and B & B Investment Co. |
| 1952 | 2,000 | Dave Beck. |

During the years 1943 through 1953, Beck and Brewster were the signators on the Joint Council No. 28 Legal Fund bank account. Beck, as president of Joint Council No. 28, along with Brewster, controlled the funds in the Joint Council No. 28 Legal Fund bank account. Brewster often signed Joint Council No. 28 Legal Fund checks in blank and made them available to Beck.

Beck, as president of Joint Council No. 28, along with Brewster, controlled the funds in the Joint Council No. 28 General Fund bank account. During the year 1951, the sum of $100 was transferred from the Joint Council No. 28 General Fund bank account to the bank account of Beck.

During the year 1949, Beck received a check for $963.85 from the Joint Council No. 42 Public Relations Division Special Account which was deposited in the Lindsay Construction Co. bank account.

During the year 1949, $2,000 was transferred from the Washington Teamsters' bank account of Joint Council No. 28 to John Lindsay Construction Co.'s bank account.

From April 6, 1943, until June 1, 1953, Beck and Verschueren were

the signators on the Washington Teamster's bank account of Joint Council No. 28. Beck, as president of Joint Council No. 28, controlled the funds of the Washington Teamster's bank account. Verschueren and Beck were the only signators of this bank account. Verschueren handled financial affairs for Beck, including payment of Beck's personal bills.

The Becks used a nonunion bank account at the Bank of California, Los Angeles, Calif., known as "Joint Council No. 42 Public Relations Division Special Account" which was maintained by Raymond Leheney as a conduit for some of the money forwarded to Nathan W. Shefferman and John Lindsay, Jr., a building contractor in Seattle, Wash. The source of the funds deposited in this account which were forwarded to Shefferman and Lindsay, was the Western Conference of Teamsters, Seattle, Wash., and the International Brotherhood of Teamsters, Washington, D.C.

In 1952, Beck had the Laundry Workers International Union, located in Indianapolis, Ind., forward their check for $6,000 to Shefferman to reimburse Shefferman for personal expenditures made on behalf of the Becks. The Becks caused a check in the amount of $6,000 to be issued by the Western Conference to reimburse the Laundry Workers International Union.

Beck also caused checks to be written on Joint Council No. 28, Seattle, Wash., Legislative Fund, and the Joint Council No. 28 Promotional League Fund to Shefferman to reimburse the latter for expenditures which had been made by him on behalf of the Becks for their personal benefit.

In 1952, a $4,729.64 check payable to Shefferman was caused by Beck to be drawn against funds contained in a Western Conference bank account. In the years 1948 to 1953, inclusive, additional checks totaling $96,660.48, all payable to Shefferman, were drawn against funds contained in the Western Conference bank account and in various other union bank accounts by Beck. These checks were made payable to Shefferman for the purpose of reimbursing him for expenditures which he had made on behalf of and for the personal benefit of the Becks during this period. At the direction of Beck, all of these checks were shown on the books of the various unions as ordinary union expenses.

Verschueren, Sr., paid many of the Becks' personal bills by checks drawn on Verschueren's personal bank account at the Seattle-First National Bank, Seattle, Wash. Beck caused checks to be written to Verschueren, Sr., on the Western Conference of Teamster's bank account to reimburse him for these expenditures. The checks issued by the Western Conference of Teamsters were, at Becks' direction, charged to expense on the union's books of account.

In 1949, an account under the name of Fred Verschueren, Trustee,

was opened at Peoples National Bank, Seattle, Wash. Beck caused checks to be written on the Western Conference of Teamster's bank account to Fred Verschueren, Trustee, and many of these checks were deposited in the Fred Verschueren "trustee account." Checks were then drawn on the Fred Verschueren Trustee account to pay the Becks' personal bills. No union official or employee except Beck and Verschueren, Sr., knew about this account.

### Specific Unallowable Deductions in the Years 1958 to 1961, Inclusive

In 1958, Dave Beck received a $1,514.95 travel expense allowance from the International Union which he reported in his Federal income tax return filed for that year but in respect to which he deducted in the same return a like amount for "travel expenses expended." Dorothy Beck received her split-income benefit of this deduction through the filing of a separate return for that year. No part of the $1,514.95 involved was in fact expended by the Becks for any business purpose. Details of this item have been set forth, *supra*.

In 1960, Dave Beck deducted from the income reported on his return filed for that year, $597.14 as interest allegedly paid to or on behalf of one C. N. Lantz and $453.34 as interest allegedly paid to or on behalf of Dave Beck, Jr. Dorothy Beck received her split-income benefit of the aforementioned deduction through the filing of a separate return for that year. No such interest payments were in fact made by either of the Becks.

In 1961, a joint income tax return was filed by petitioner and the Estate of Dorothy Beck in which there was deducted from reported income, $1,360.24 as interest allegedly paid to or on behalf of C. N. Lantz, and $610.24 as interest allegedly paid to or on behalf of Dave Beck, Jr. No such interest payments were in fact made by the Becks.

### Criminal conviction

Dave Beck was indicted in May 1957 on two counts under sections 145(b) and 3793 [7] of the 1939 Code. In August, he was indicted by the

---

[7] SEC. 145. PENALTIES.

(b) FAILURE TO COLLECT AND PAY OVER TAX, OR ATTEMPT TO DEFEAT TAX.—Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

SEC. 3793. PENALTIES AND FORFEITURES.

(b) FRAUDULENT RETURNS, AFFIDAVITS, AND CLAIMS.—

(1) ASSISTANCE IN PREPARATION OR PRESENTATION.—Any person who willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a false or fraudulent return, affidavit, claim, or document, shall (whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document) be guilty of a felony, and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

same grand jury on three additional counts under section 145(b) and two additional counts under section 3793(b)(1), *supra*, and with co-defendants [8] under section 371 on two counts charging a conspiracy to evade payment of his taxes. The seven counts which named Beck alone were segregated for trial. The trial began on November 10, 1958, and at that time the Government dismissed one of the counts against Beck. In February 1959, a jury returned verdicts of guilty as to the remaining six counts, charging him and his wife with willful evasion of their personal income taxes for the years 1950 through 1953, inclusive, and his willful particpation in the preparation and presentation of Form 990 returns in the years 1950 and 1952 [9] for the Joint Council No. 28 Building Association, an exempt organization. Dave Beck was sentenced to 5 years imprisonment, required to pay costs amounting to about $11,000, and various fines totaling $10,000. *United States* v. *Beck*, an unreported case (W.D. Wash. 1959, 59-2 U.S.T.C. par. 9486, 3 A.F.T.R. 2d 1364). On appeal in *Beck* v. *United States*, 298 F. 2d 622 (C.A. 9, 1962), the District Court was affirmed with respect to the two "990" counts under section 3793(b)(1), *supra*, and the conviction of Beck on the four counts of income tax evasion were reversed and set aside, and such four counts were remanded for a retrial in the District Court.

ULTIMATE FINDINGS

There was an underpayment of income tax by the Becks for each of the taxable years 1943 through 1953, inclusive, and for 1958. A part of such underpayment determined for each of the years 1943 through 1953 on the part of petitioners, and for 1958, with respect to Beck's separate return is due to fraud with intent to evade tax.

False and fraudulent returns for each of the years 1943 through 1953, inclusive, were filed by petitioners and for 1958 by Beck and, therefore, deficiencies for those years are not barred by the statute of limitations. Since the administrator *de bonis non* of Dorothy Beck's estate waived the statute of limitations and extended the period for assessment of deficiencies against her until December 31, 1965, the deficiency against her for 1958 is not barred by limitations.

In each of the years 1945 to 1952, inclusive, petitioners are liable for additions to the tax under section 294(d)(2) of the 1939 Code

---

[8] Beck's codefendants were Nathan W. Shefferman, Shelton Shefferman, Norman J. Gessert, Warren David Beck, also known as David Beck, Jr., and Fred Verschueren, Sr.

[9] The Form 990 for 1950, 1951, and 1952 represented that certain payments had been made by the Building Association for construction, alterations, and other related work on its behalf when actually such payments (as reflected on the records of John Lindsay and corroborated by his testimony at the criminal trial) had been made to John Lindsay for construction and improvements on Beck's home in Sheridan Beach.

by reason of the Becks' substantial underestimation of taxes in their declaration of estimated taxes in those years.

The rental value to the Becks of the home provided for them by the International Union rent-free in the years 1958 and 1959 and at a rental of $400 per month in 1960 and 1961 was $1,000 per month in each of those years.

The Becks in 1960 received from Sunset Distributors, Inc., *inter alia*, a 10-year lease agreement on a building conveyed to petitioner by Sunset in settlement of Beck's lawsuit against the corporation, having a fair market value of at least $85,000, which in fact constituted compensation to Beck in that year for services performed in the past.

The Becks are not entitled to deduct from their Federal income taxes in 1960 and 1961 alleged interest expenses paid on behalf of two individuals.

OPINION

## *Use of Net Worth and Expenditures Method*

At the threshold of our discussion of the issues involved herein, we note that petitioners do not appear to seriously contest respondent's right to resort to the comparative net worth plus expenditures method in reconstructing their taxable income during the years ended December 31, 1943, through December 31, 1953, inclusive. Petitioners' primary objection is to the effect that Dave Beck received loans in the aggregate amount of $370,110.16 from union entities during the taxable years involved which respondent failed to take into account in determining their income under this method and that the loans were sufficient in amount to account for much of the alleged unreported income. In the same vein, petitioners aver that respondent indulged in guesswork and unfounded inferences with respect to several material items in the net worth schedule and that the net worth method, when properly applied to the facts of record, establishes that petitioners fully reported their taxable income for the period in question.

We have considered so frequently the circumstances under which application of the net worth and expenditures method is appropriate that an extended discussion here would serve no useful purpose. Succinctly, the evidence shows that petitioners' books and records for the taxable years under review were scant, highly inadequate, or unavailable. Also, because of petitioners' failure to provide respondent with these records, it was necessary for him to conduct an extensive investigation which extended through several States, and in large measure, to rely on third-party records for the determination of petitioners' income for the years in operation. Obviously, petitioners' diffi-

culty is of their own making in failing to maintain proper records of their extensive business activities and other facts material to the determination of their income tax liability. An examination of our findings demonstrates that the use of the net worth method by the respondent was fully justified as a test of the accuracy of the petitioners' income tax returns and also as significant evidence of their correct net income. *Carmack* v. *Commissioner*, 183 F. 2d 1 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court, certiorari denied 340 U.S. 875 (1950) ; *Frank Imburgia*, 22 T.C. 1002 (1954).

By a showing of a substantial increase in net worth in excess of reported income without reasonable explanation of such discrepancy as being attributable to loans, gifts, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the overall accuracy of income reported on the books and on the returns. *Michael Potson*, 22 T.C. 912 (1954), affirmed sub nom. *Bodoglau* v. *Commissioner*, 230 F. 2d 336 (C.A. 7, 1956) ; *Estate of George L. Cury*, 23 T.C. 305 (1954) ; *Harry Gleis*, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957).

On the basis of the foregoing discussion, we approve respondent's use of the method in the case before us, *J. K. Vise*, 31 T.C. 220 (1958), affd. 278 F. 2d 642, 643 (C.A. 6, 1960).

### *Understatements of Income*

Initially, we discuss the burden of proof as to the deficiencies to avoid repetition as we progress.

The burden of proof rests with petitioners to show error in respondent's determination of deficiencies. In *American Pipe & Steel Corp.* v. *Commissioner*, 243 F. 2d 125 (C.A. 9, 1957), affirming this Court's opinion at 25 T.C. 351, the Court of Appeals said, in part:

Petitioner having invoked the jurisdiction of the Tax Court, entered the hearing burdened with the duty of establishing by at least a preponderance of the evidence that the determination made by the Commissioner was erroneous. * * *

Respondent contends that Dave and Dorothy Beck, during the taxable years 1943 to 1953, inclusive, and the years 1958 to 1961, inclusive, received and failed to pay income taxes on substantial amounts of income which they omitted from their Federal income tax returns filed for those years. [Docket Nos. 858–66 to 861–66, inclusive.] Essentially, it is respondent's position that by a variety of methods, petitioner was able to obtain money from union entities for the personal benefit of his wife and himself and that petitioners deliberately and willfully failed to pay taxes on this income during the taxable years involved. In support of his position, respondent submitted a net worth schedule with his notice of deficiency showing that Beck succeeded

in increasing his and his wife's net worth almost ten-fold in an 11-year period. According to respondent's net worth computation, which we have adopted with minor adjustments, petitioners' beginning net worth expanded from $89,472.21 at the beginning of the year 1943 to $839,433.75 by the end of 1953.

Respondent's net worth schedule contains, *inter alia*, approximately 190 items and virtually all of these items are either stipulated, conceded, or uncontested.[10] Petitioners contend that respondent's net worth statement is overstated in several material respects. Our own practical approach to a resolution of the issues presented is to consider those items of the net worth statement with respect to which the petitioners expressly disagree, together with those which evolve upon a consideration of the record as a whole. The remaining items, with respect to which petitioners have failed to point out error and have not met the burden of proof, will be reflected in our ultimate determinations, but will not be separately or specifically considered. As it is, our opinion is protracted to unusual length because of the issues actually in dispute, the numerous accounting details involved, and the complexity of reconciling and applying the various conclusions we have reached.

(1) *Cash on hand (item A–1)*.—For the period ended December 31, 1953, respondent shows cash in the total amount of $40,547.90 and included in this total amount is "cash on hand" in the sum of $15,953.10, which is the only cash item in dispute.

Petitioners, in their petition, did not allege any error specifically with respect to respondent's determination of cash on hand as of December 31, 1953. Their petition merely avers broadly that although they do not dispute "certain items" in the net worth statement, this should not be construed as an admission of the correctness of respondent's determination. Petitioners, on brief, urge that they had cash on hand at December 31, 1953, only in the amount of $3,000. However, they acknowledge that in addition they had a cashier's check dated October 15, 1953, in the amount of $12,953.10 payable to Dave Beck which was cashed by him on December 28, 1953. But petitioners deny having this $12,953.10 in the form of cash on hand 3 days later, that is, December 31, 1953. They maintain that respondent erroneously assumed that these funds were still on hand at the end of 1953. Respondent, in opposition, contends that during the critical period from December 28, 1953 (when a $12,953.10 cashier's check was cashed by Beck), to January 13, 1954 (when the $14,500 *cash* deposit was made in Beck's B & B Investment Co. bank account), the $12,953.10 check

---

[10] The parties introduced a 110-page stipulation and 12 supplemental stipulations which included detailed facts as to several hundred items which petitioners are charged with receiving and not including on their income tax returns for the years under review.

(which had previously been converted from a $13,500 cashier's check on September 23, 1953), remained in the hands of Fred Verschueren, Sr., who had been holding it for Beck and that the $12,953.10 was ultimately included in the aforementioned cash deposit of $14,500 on January 13, 1954, and hence the $12,953.10 was still on hand and includable in the $15,953.10 as of December 31, 1953.

Revenue Agent Paul Garrett testified that he investigated the item in dispute and that the cash deposit of $14,500 which Beck made on January 13, 1954, at the Seattle-First National Bank included the $12,953.10 in cash obtained from the bank draft in the latter amount cashed on December 28, 1953. While it is somewhat difficult to trace the series of transactions leading up to the cash deposit on January 13, 1954, and to pinpoint with complete exactitude the ultimate disposition of the $12,953.10 in question, we find Garrett's analysis of the overall transaction plausible. Howbeit, petitioners, who bear the burden of proof, have not adduced any affirmative evidence to show that the $12,953.10 in cash was not on hand as of December 31, 1953, and accordingly we approve respondent's determination as to this item.

(2) *Lazy Valley Ranch, Inc. (Item B–15)*.—Prior to and during the taxable year 1953, petitioner and Alexander Grinstein owned about 640 acres of land which they leased to a corporation, Lazy Valley Ranch, Inc. The ranch was owned and operated by Dave Beck, Jr., and others. Petitioner advanced about $22,200 to the ranch for its operating expenses of which $13,094.28 was repaid to him by the corporation during 1952.

The controversy herein involves three deposits totaling $4,000 to the bank account of the ranch which respondent included in the balance of the accounts receivable in the amount of $9,637.55 for the year ended December 31, 1953. Petitioners agree only to an ending balance for this year of $5,637.55 and contend that they did not supply the additional $4,000 in dispute. The record shows three cash deposits totaling $4,000 deposited between May 12, and June 14, 1952, to the ranch account at the Seattle-First National Bank. Moreover, copies of the bank statements of the ranch account for this period show one of the three deposits in question as being a $1,000 loan from Beck and on two occasions the name "Beck" opposite the cash deposits was scratched out. Petitioners urge that the Deposit slips prove that the amounts thereon were not received from Beck since his name was "intentionally" scratched off the deposit slips. In the absence of any cogent evidence relating to the circumstances under which Beck's name was scratched off these slips, we do not accept petitioners' argument. Aside from the notation on the deposit slips, respondent included the

$4,000 in the account receivable upon the testimony of Baker to the effect that all funds for the operation of the ranch were contributed by petitioner. The parties stipulated that $22,200 was expended by Dave Beck for the Lazy Valley Ranch, Inc., and that in 1952, of this amount, $13,094.28 was repaid to him by the corporation.

In view of the foregoing and since petitioners have not presented any convincing evidence to support their contention, we sustain respondent on this issue.

We add for completeness that the account receivable balance for the year ended December 31, 1953, is overstated in the amount of $68.30 for the reason set forth in our Findings of Fact with respect to item B–15, and the net worth statement will be adjusted accordingly.

(3) *Sick's Seattle Brewing & Malting Co. (item C–19).*—Petitioners contend that 1,000 shares of Sick's stock held in the name of Reta Henne, Dave Beck's sister, had been given to her as a gift and therefore was not properly includable in respondent's net worth statement.

The record shows that Reta Henne was a nominee for petitioner with respect to the ownership of several different issues of stock, including at one time, the Sick's stock involved herein. In similar vein, it is stipulated that in about 1935, Beck purchased 100 shares of Sick's stock from Emil Sick for $2,000 which were issued in the name of Reta Henne. This stock was later reissued in the name of D. W. Marshall, another nominee of petitioner. Thereafter a stock dividend of 15 to 1 was declared. During 1946 and 1947, 1,000 shares of Sick's stock were transferred to the name of Reta Henne from the stock certificates which previously had been purchased by Beck, issued in the name of D. W. Marshall, subsequently endorsed by D. W. Marshall and returned to Beck. Then in 1948, Beck deposited with Foster & Marshall, a stock brokerage firm, 1,000 shares of Sick's stock in an account designated Reta Henne and the balance of 2,762 shares in an account designated D. W. Marshall.

Petitioner testified that he did not know when he made the alleged gift of 1,000 shares of Sick's stock to his sister but that he gave her "those things from time to time to help her out." Apart from this vague and general testimony, Beck did not introduce any affirmative evidence (such as a gift tax return) to prove to our satisfaction that he had made a gift of the stock to his sister. Reta Henne did not testify in the instant proceeding nor was her unavailability explained in the record. Clearly, respondent was under no obligation to present evidence to rebut a fact alleged but not proven by petitioners. In our view, the failure of petitioners to introduce evidence within their possession which, if true, would be favorable to them, gives rise to the

344

presumption that if produced it would be unfavorable. *Wichita Terminal Elevator Co.*, 6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947).

Upon the record, we will not disturb respondent's determination as to this issue.

(4) *Improvements—Lazy Valley Ranch* (*item E–16*).—Respondent determined that petitioners made improvements to the Lazy Valley Ranch during 1950 through 1952, inclusive, totaling $14,192.87. Petitioners concede that they paid the aggregate amount of $8,517.27 for such improvements during these years but deny that they made the balance ($5,675.60) of such payments for improvements. Petitioners contend that the expenditures in question ($5,675.60) were, in fact, made by Dave Beck, Jr.

We believe it is clear from the testimony of Carl J. Baker and Norman Gessert, officers of the Lazy Valley Ranch corporation, that petitioner alone paid for improvements on the ranch property which included the expenditures in issue. Gessert, who is Dorothy Beck's cousin, testified unequivocally that petitioner loaned the money to Dave Beck, Jr., and to Baker to start the cattle raising operation at the Lazy Valley Ranch but that petitioner alone paid for the bulldozing work at the ranch to obtain more grazing land for the cattle. In this connection, Baker testified that he was concerned about substantial improvements being made on the ranch such as the installation of posts and wire and petitioner assured him that he (Baker) "was not responsible for a five cent piece spent on that ranch at all."

Petitioners who have the burden of proof, failed to introduce any cogent evidence to support their contention and under the circumstances, we must uphold respondent on this item.

(5) *Sheridan Beach construction* (*item E–21*). Petitioners, in their petition, allege generally that the assets listed under Sheridan Beach Construction (item E–21) on respondent's net worth statement were not includable in the computation because these assets "were of benefit to individuals and entities other than the taxpayers." At the trial, petitioners contend specifically that the total amount of $165,-645.86 which respondent determined had been paid to John Lindsay, Jr. ($94,508.78), Einar Rasmussen ($11,487.55), and Lindsay Construction Co. ($59,649.53), with respect to construction at Sheridan Beach No. 2 (lot 23, Block 3) as of December 31, 1953, was overstated in the amount of $60,000 and should be reduced accordingly. In essence, Beck urges that he had nothing to do with the building of the nine homes located in the Sheridan Beach compound other than his own residence and that the $60,000 in controversy may have been spent on these nine houses.

The evidence shows that in 1948, the Becks established a nominee bank account under the name of John Lindsay Construction Co. at the Seattle-First National Bank, Seattle, Wash., in order to have funds available to build houses for themselves and several union employees within the Sheridan Beach compound. Substantial amounts were thus expended at the direction of petitioner through this account, plus $13,253.07, which was paid direct to Sears, Roebuck & Co. for construction materials. Revenue Agent Garret (who worked on respondent's net worth schedule) interviewed home owners in the compound who had purchased their homes from Beck at cost and verified the amounts expended by him (under the name of John Lindsay Construction Co.) for construction in Sheridan Beach before including such amounts in the net worth computation. In this connection, we note that Norman Gessert, a union employee and one of the home owners in the compound, testified that Beck advanced $10,000 to him for the construction of his home, which amount he repaid to Beck sometime during 1958.

We reject petitioners' contention that Revenue Agent Hupf, who investigated the construction in question, testified that item E–21 was overstated in the amount of $60,000. Hupf testified that because of the confusion arising from the construction of the nine other homes on the Sheridan Beach property, he was not sure that all of the amounts involved were expended exclusively on the construction of Beck's residence and that some of the $60,000 in dispute conceivably may have been expended on lots 14, 15, and 16, which were other properties owned by Beck at Sheridan Beach. In the course of his testimony (at the criminal trial) as to his computation of the cost of Beck's residence, Hupf stated that he had to make an "informed guess" as to such cost because various expenditures could have been made on other houses which Beck had built in the Sheridan Beach compound and sold to union employees.

Petitioners have not presented sufficient evidence to support their position. The books and records of the Lindsay Construction Co. (which received some $94,508.78 as of December 31, 1953, for its work in the compound) were kept by Norman Gessert's wife. Petitioners failed to introduce the testimony of either Gessert's wife or Einar Rasmussen (who received $11,487.55 as of December 31, 1953, for his construction work in the compound). From this we can only infer that their testimony would have not favored petitioners' contention herein on this issue. *Wichita Terminal Elevator Co., supra.*

In our opinion, the important factor is that all of the money involved in the construction under review constituted the proven expenditures of petitioners. Whether a part of these expenditures ($60,-

000) should be allocated to other property belonging to Beck in the Sheridan Beach area instead of to his own residence or to loans or gifts to others does not change the net result one iota. In intimating that there has been a duplication of "cash payments" and "billings" in 1951, the petitioners ignore the fact that it has even been stipulated that the payments which Beck admittedly made to Lindsay in 1951 were not shown in the listed statements submitted by Lindsay in 1951 and 1952. Manifestly, it really makes no difference whether the disputed amounts ($60,000) are attributable to Beck's residence or to other items (such as nondeductible expenditures) on the net worth statement. The decisive factor is that these have been proven to be expenditures of petitioner on properties in the Sheridan Beach area with which he was involved during the net worth period.

In light of the foregoing, respondent's determination on this issue must be sustained.

(6) *Miscellaneous assets (item H)*.—Respondent determined that the aggregate amount of $59,951.53 was expended by or on behalf of petitioners for the improvement of their property in Sheridan Beach Addition No. 2.

Petitioners acknowledge the correctness of the amount relating to each item involved (H–1 through H–23), the named payee, and the nature of the expenditure, but do not agree that the entire amount of the listed sum should be added to petitioners' net worth or personal expenditures. In essence, petitioners contend that since Beck traveled some 300 days of the year, the remaining 65 days were of great importance in conducting union business in the Seattle area and that his residence was "a focal point of union activities and entertaining." In the same vein, he urges that he "borrowed" funds from various union entities during 1948 through 1952 to construct a residence which would provide a prestigious place to carry on union affairs and enhance the bargaining position of the president of the International Union. Respondent, on the other hand, maintains that the residence was entirely personal and that all of the various expenditures with respect thereto were of a nonbusiness nature.

We do not doubt that Beck built a veritable showplace at Sheridan Beach which was imposing in the community and that he from time to time during the period involved entertained neighbors, union members, and officials who visited his home. Ostensibly, visitors of all walks of life must have been impressed by the spaciousness of his home and its facilities for entertaining large numbers of guests. It is also obvious that on these occasions when the Becks entertained, union activities were discussed formally or informally, which is not unusual when individuals with the same interests meet. However, petitioner did

not introduce any affirmative evidence which would pinpoint the frequency or nature of such meetings. We are not convinced by the evidence that the purchase, improvements, and ownership of this personal residence served any necessary or useful business purpose of petitioner; and we are convinced it was not held for the production of income. Consequently, we hold that respondent properly included the miscellaneous assets in controversy in petitioners' net worth computation.

Petitioners contend, on brief, that since substantially all of the cost of their home and the subsequent improvements thereon was for the purpose of building a "business-oriented residence," they should be entitled to depreciate the residence from the date of its improvement in 1948 through the 5-year term of Beck's presidency, commencing in the first part of 1953. Suffice it to say, we will disregard a question raised on brief when it was not pleaded in the original petition or raised by proper amendment thereto. *H. D. & J. K. Crosswell, Inc.*, 6 B.T.A. 1315 (1927). Moreover, for reasons discussed hereinabove concerning the Beck's residence as a place for business entertaining and meeting, we hold that petitioners are not entitled to depreciation of their personal residence.

(7) *Assets acquired through Shefferman (item H-24).*—In his net worth schedule, respondent included under item 24, Miscellaneous Assets, the subtitle "Assets acquired through Shefferman," cumulative total amounts for various personal miscellaneous assets which petitioners acquired during the years 1948 through 1953, inclusive. Petitioners contend that some of the assets acquired from Shefferman during this period were not includable in their net worth assets since they were bought on behalf of his union or for business purposes. We shall consider each of the categories of disputed assets separately.

| | |
|---|---|
| (a) Furniture for residence | $13,802.92 |
| (b) Furniture for petitioners' apartment at Washington, D.C. | 2,516.87 |
| (c) Carpets charged to Beck | 6,951.27 |
| (d) Clothing purchased by Beck | 3,227.39 |
| (e) Fixtures for residence at Sheridan Beach | 2,889.87 |
| (f) Kitchen utensils for residence | 2,043.45 |
| (g) Kitchen utensils for Washington, D.C., apartment | 1,048.11 |
| (h) Luggage | 295.00 |

With respect to the checks paid by Shefferman for (a) and (b) hereinabove, i.e., furniture in petitioners' two residences, petitioners urge that their home in Sheridan Beach, Seattle, Wash., was maintained "for the convenience of the union" and that the apartment in Washington, D.C., was used "exclusively for business." Petitioners did not introduce any convincing evidence to support their contention and hence we sustain respondent as to these payments.

As to the aforementioned (c), carpets charged to Beck in the amount of $6,951.27, petitioners argue that it would "appear obvious that at least one-half of this amount was owned by the Teamsters Building, the apartment maintained in Seattle by the union, and third parties." Considering the large amount of goods which Beck admittedly purchased through Shefferman for his personal use during the period involved and absent any persuasive evidence to the contrary, we find no plausible reason to assume that any part of the carpets in question were bought for or by anyone other than Beck. No affirmative evidence was introduced to establish that any of the carpeting purchased by Beck was installed in the Teamsters Building or in the apartment maintained by the union in Seattle. Petitioners, who have the burden of proof, failed to adduce any convincing evidence to support their position as to this item and therefore we must sustain respondent.

As to (d), clothing purchased by Beck in the sum of $3,227.39, petitioner avers that a "substantial portion" of this amount was business gifts to union personnel. No affirmative evidence to support his self-supporting and vague testimony concerning business gifts was introduced and for failure of proof, we uphold respondent on this item.

Petitioners made no specific contention as to (e), (f), and (g) hereinabove; therefore, we also sustain respondent with respect thereto.

Petitioners contend that (h), luggage in the amount of $295, should be allowable as a business expense and therefore was not includable in their net worth. It is petitioners' position that Beck traveled on union business as much as 300 days out of each year during the period involved and used this luggage on the trips. Respondent avers that the cost of the luggage was all personal expense and not deductible.

Petitioners, of course, have the burden to prove that this expense was not personal. Apart from petitioners' bare assertion that Beck bought $295 worth of luggage from Shefferman which he used when traveling on union business, no evidence was introduced to establish to our satisfaction that Beck used it exclusively for such purpose. Howbeit, even if he used the luggage on business trips, we consider it to be a personal expenditure incidental to his business activities. Accordingly, we hold that the luggage in question was a nondeductible personal expense under section 24(a)(1) of the 1939 Code and sustain respondent as to this item.

We find no merit in petitioners' contention that respondent's determination with respect to item H–24 was based on the information obtained from Ouska without further verification by Revenue Agent Garrett. The latter testified that he eliminated the purchases reflected in Ouska's records which were delivered to third parties. Garrett was justified in relying on the notations in the bookkeeper's check book as

to the disbursements involved without making an independent investigation concerning each transaction handled by Shefferman's office. The fact that two television sets were charged to Beck in 1951, two in 1952, and three in 1953, according to Ouska's records, does not alter the fact that they were assets purchased for Beck's personal use since he could have used them in his spacious home at Sheridan Beach and his apartment in Washington, D.C. No evidence to the contrary has been introduced by petitioner.

(8) *Gifts (item J-2).*—With respect to "Gifts (item J-2)," respondent determined that certain items were purchased through Nathan Shefferman by petitioner and his son, Dave Beck, Jr., for the latter and others and that the cost thereof constituted gifts made by petitioners. Therefore, in his computation of petitioners' net worth for the period involved, respondent added "Nondeductible expenditures," which included the item "Schedule," and for the years 1948 through 1953, an aggregate amount of $12,475.37, representing gifts or nondeductible expenditures.

As set forth in our Findings, *in extenso*, during these years, checks were drawn on the account of Shefferman for merchandise for Dave Beck, Jr., petitioner's sister, Reta Henne, and others in the total amount of $12,643.06. In Supplemental Stipulation of Facts No. 7, petitioners concede that of these checks, two of them, totaling $350.20, are nondeductible gifts and deny that the balance ($12,125.17) were nondeductible gifts made by them.

Petitioner contends that he was reimbursed by Dave Beck, Jr., for all merchandise delivered to the latter by Shefferman and hence the so-called gift items in question should be excluded from nondeductible expenditures on the net worth statement. In this connection, Beck testified on direct examination that Dave Beck, Jr., "reimbursed" him for the items in controversy and a union check may have been issued to Shefferman in payment of these items. This testimony appears to be inconsistent with the stipulation that Dave Beck, Jr., bought various items and appliances through Shefferman for his friends and collected the money. Shefferman would pay for these items and be reimbursed by petitioner. Dave Beck, Jr., collected the money from his friends and used it or put it in his own bank account. These moneys were not taxed to Dave Beck, Jr., "but were treated as gifts from his father." Also, we note that testimony in the criminal trial with respect to the purchases made through Shefferman was to the effect that many of the purchases were intended as gifts to the recipients.

A record may be judged by the absence of testimony as well as by its presence. Petitioners, who bear the burden of proof in the instant

case, have not introduced any of the recipients of the merchandise in dispute as witnesses who could have possibly shed some light on the matter, nor have petitioners directed our attention to any substantive testimony (or documentary evidence) in the criminal proceeding in support of their position. Petitioners' unexplained failure to present these parties to testify gives rise to a presumption that had they testified and told the truth, their testimony would have been unfavorable to petitioners' cause. *Wichita Terminal Elevator Co.*, *supra*.

Accordingly, we hold for respondent on this issue.

(9) *Nondeductible expenditures (item J–3)*.—With respect to this classification of expenditures on the net worth schedule, in Supplemental Stipulation No. 7, the parties stipulated that all of the items set forth in our Findings of Fact with respect to this issue were expended by or on behalf of petitioners and were properly treated as nondeductible personal expenditures by respondent, except for item J(3)(i):

| | | |
|---|---|---|
| December 1950 | Candy | $213. 21 |
| December 1951 | 15 boxes candy | 115. 88 |
| July 1952 | 7 swimsuits | 115. 00 |
| July 1952 | 14 swimsuits | 74. 62 |

Section 23(a) of the 1939 Code allowed the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 24(a) of the 1939 Code prohibited deducting from net income personal, living, or family expenses. Whether or not a particular expenditure is a deductible business expense turns on the facts of each case and the burden of proof is on the petitioner to show that such expenditures were primarily business rather than personal expenses.

It is settled that a personal gift is not an ordinary and necessary expense of carrying on a trade or business, but where expenditures for gratuities bear a proximate relationship to a taxpayer's business and are for the promotion of that business, they may be deductible even though voluntarily made. See *Olivia de Havilland Goodrich*, 20 T.C. 323, 332 (1953). Here, we do not think the burden of proof is met by petitioners' bare assertion, on brief, that the candy (in the total amount of $329.09) was for business gifts and that the 21 swimsuits were bought for use in the pool at his residence in connection with business entertainment. Apart from petitioner's general testimony as to the expenditures in dispute which was unpersuasive, no evidence has been introduced to show that any part or all of the expenditures were so closely related to the conduct of Beck's business as to have been appropriate, helpful, usual or necessary. Petitioner

made no showing of the reason or occasion for the gifts of candy. There is nothing in the record to show that gifts of this type were customary in petitioner's business as a union official. If it were in the nature of payment to the recipients thereof for services rendered to him or the union entities, he has not so shown. *Donald G. Teeling*, 42 T.C. 671, 686 (1964). Nor has petitioner persuaded us that the swimsuits were used for "business entertainment" at his home.

We observe that in cases where expenditures of a social nature (such as gifts of candy or the purchase of bathing apparel for houseguests) have been held to be deductible business expenses, proof was presented to show that such expenditures had a direct relation to the conduct of a business or the business benefits expected. Such proof has not been presented here to demonstrate that the expenditures in question are deductible under section 23(a). For failure of proof, we sustain respondent on this issue.

(10) *Boarding of dogs by Woodrow Madsen (item J–(bb))*.—Respondent's net worth statement shows that he added "Nondeductible expenditures" to the "above-the-line" net worth increases for the period involved. These nondeductible expenditures consist of (1) income tax paid, (2) gifts, and (3) personal expenditures, which included some 56 separate items. Included in this latter category is the item "Boarding of dogs by Woodrow Madsen" and shows total expenditures of $4,250 during the years 1947 through 1953, inclusive, for the care of petitioner's dogs. Petitioners contend that this item should not have been included in any part of the net worth computation. It is petitioners' position that in 1947, Beck leased a building to Madsen, who operated a dog kennel, and the lease provided that the lessee would board four dogs belonging to Beck without cost for the term of the leasehold. Respondent maintains that petitioners received monetary value for the dogs' board which was equivalent to a nondeductible personal expenditure by petitioners.

The evidence shows that under a lease arrangement between petitioner and Madsen for the boarding of Beck's dogs, Madsen kept the animals on property leased by him from Beck; and instead of paying Madsen the customary board fees directly, Beck simply reduced the rental in the amount stipulated by the parties, i.e., $25 per month per dog boarded. Computed at this rate, Madsen's charges for boarding Beck's dogs would have totaled $4,250 during 1947 through 1953. We hold that the boarding fees are properly includable in the net worth statement as rental income to Beck or the cash equivalent thereof. Because of their cash equivalence, they are properly includable in the net worth computation. To hold to the contrary would result in the allowance of a nondeductible expenditure.

Although the rental income provided for in the lease appears to

constitute the acquisition of an asset (i.e., cash on hand) by petitioners, under the circumstances, we believe it is more accurate to treat the reduced amount of rent as a cash equivalent which was used by the Becks for a personal living expense in the year the rental payment was earned or due rather than as a tangible asset above the net worth line.[11] In the net worth computation, respondent included the separate item "other living expenses—estimated" in the amount of $10,000 a year from 1943 through 1949, inclusive. Petitioners do not urge that the kennel expenditure in dispute is already reflected in these estimated living expenses which is also in the "personal expenditures" subsection of "nondeductible expenditures." In the absence of any evidence to the contrary, we believe that the rental income earned but not physically received by Beck in cash was used for petitioners' living expenses (boarding of dogs) above and beyond the amount determined by respondent with respect to the estimated living expenses and, therefore, respondent was entitled to include the boarding of dogs as an additional item in the category of nondeductible personal expenditures. It is clear that if Beck did not have the special lease arrangement herein with Madsen but had boarded his dogs as any ordinary customer, the actual cash payment for this purpose would constitute a nondeductible personal expenditure and, including living expenses, would be added to the yearend increases in net worth. *Holland* v. *United States*, 348 U.S. 121, 130 (1954).

Here, the item in dispute could more precisely be defined in the net worth statement as "Rental income earned but not physically received (offset for kennel services rendered to Becks by lessee)." This rental income never reached the state of becoming a tangible or capital asset "above-the-line" in the net worth statement, but rather was expended for personal living. Respondent placed the item below-the-line because it is the same as if Beck had received the full amount of the rent and paid a portion thereof to the lessee for kennel services, in which case this payment would properly be classified as a nondeductible personal expenditure.

Under the net worth plus expenditures method in determining the amount of taxable income for any period, all nondeductible expenditures made by a taxpayer during the period are added back to the tangible net worth increase as representing the expenditure of additional resources available to the taxpayer over and above the increase in net worth which would augment his gross income.[12] We believe this is a logical approach because many expenditures (viz, Federal income taxes, political contributions, trips, divorce settlements, personal living expenses, and *other similar items*) are made during a year which are not for tangible or capital assets.

---

[11] Schmidt, Legal and Accounting Handbook of Federal Tax Fraud 325 (1963).

[12] *Michael Potson*, 22 T.C. 912, 927 (1954).

In view of the foregoing, we sustain respondent's inclusion and treatment of the disputed item in the net worth statement.

(11) *Estimated living expenses (item J–3(bc))*.—In his net worth computation respondent included the item "other living expenses—estimated" in the amount of $10,000 a year from 1943 through 1949, inclusive. (During the year 1944, respondent actually shows this item to be $10,919.86). Petitioners concede an annual amount of $8,000 for the years 1943 through 1949 in terms of all items set forth under item J(3) of the net worth statement. However, petitioners contend that respondent's determination of $10,000 as their estimated annual living expense for the years 1943 through 1949 was based on "an average expense for the years 1950 through 1953," and while the method used by respondent appears to be logical, the expenses used in computing the average were, in many instances, not personal expenses but were deductible business expenses incurred on behalf of the union.

We believe that petitioners' position is without merit. The $10,000 figure used by respondent for the years 1943 through 1949 is considerably less than the average annual living expense of petitioners for the years 1950 through 1953. The parties stipulated that the average for the latter mentioned years was $26,196.70. In our view, the record does not support petitioners' contention that in computing the living expense average, respondent included deductible business expenses rather than personal expenses. Presumably petitioners urge that since some of the items included in the $10,000 average amount consisted of expenditures made in connection with the Beck residence (which petitioners contend was used for business purposes), these items constituted items of business expense. Therefore, we hold that the $10,000 amount was entirely personal expenditure and respondent's determination is upheld.

### Specific Items of Income Received by Petitioners, Omitted From Their Federal Income Tax Returns, and Sources Thereof

As corroboration of the understatements of income for the taxable years involved obtained by the net-worth approach, respondent used the "specific item" method of proof. This latter method simply consists of evidence of particular or specific amounts of taxable income received by the taxpayer during a particular tax period, with evidence that the taxpayer did not include such amounts in his tax return for such period, together with evidence concerning the taxpayer's knowledge of the omission and his intent and willfulness in attempting to avoid payment of tax by the omission. The respondent, of course, is not limited to the net-worth or the specific-item methods of proof, but may offer both. There is no restriction on the method or theories by

which respondent may test his views that unreported income exists provided they are reasonably calculated to disclose the presence or absence of unreported income, *Campbell* v. *Guetersloh*, 287 F. 2d 878, 880 (C.A. 5, 1961). See also *Kenney* v. *Commissioner*, 111 F. 2d 374–375 (C.A. 5, 1940), affirming a Memorandum Opinion of this Court; *Cohen* v. *Commissioner*, 176 F. 2d 394 (C.A. 10, 1949), affirming 9 T.C. 1156, 1162–1163 (1947).

Applying the specific-item method, respondent traced funds from the union accounts and other sources to the Becks and to others who spent the funds for the Becks' benefit. The maze of transactions which Beck arranged for this purpose took varied forms, as reflected in our Findings of Fact, *in extenso*, but the purpose and result remained constant, i.e., to increase the financial status of the Becks. In the course of tracing funds from union entities and other sources to the petitioners, respondent introduced a mass of convincing documentary evidence, based mainly on third-party records, showing specific items of income received by the Becks which were omitted from their Federal income tax returns and the sources thereof.

With respect to "expense allowances" received by Beck from union sources, the record shows that during the taxable years 1943 through 1953, inclusive, union funds were paid directly in the form of expense allowances to Beck by the various union entities with which he was associated. These allowances included *regular* monthly expense allowances paid by the International Union in the form of hotel allowances, incidental allowances, and car and railroad allowances which were deposited directly in the personal bank account of Beck's wife along with his salary checks. Other allowances paid to Beck by the International Union consisted of checks for travel allowances and railroad allowances, part of which Beck deposited in his own personal bank account and part of which he cashed for his own personal use. As set forth fully in our Findings, during the years 1943 through 1953, Beck received approximately a total of $76,366.43 as regular monthly expense allowances from the International Union. Analysis of the record shows that these allowances were not spent by petitioner for union business purposes, but rather that his business expenses were paid directly by the union entities involved herein.

In addition to the aforementioned allowances received from the International Union, Beck received checks for other travel allowances from the Western Conference which were deposited in his personal bank account; checks for travel allowances and hotel allowances from the American Federation of Labor, part of which he deposited in his bank account and part of which he simply cashed for his own personal use; and checks for convention allowances from Joint Council No. 28 which he likewise cashed for his own personal use. Admittedly the sec-

retary-treasurer, the comptroller, and members of the executive board of the International Union were all aware during the years involved that Beck was receiving expense allowances from the union even though the latter was paying his business expenses directly to the firm or party providing the goods or services. No cogent evidence was introduced by Beck to explain such duplicate payments by the International for his regular monthly expense allowances, or to explain away such dual expense allowances paid to him by other union entities. Respondent's agents, who had worked on this facet of the investigation in numerous States and overseas, testified that they could not ascertain a single instance where Beck had used his expense allowances to pay hotel or restaurant bills or to defray any travel expenses. Beck did not convince us that he ever used any appreciable amount of the expense allowances which he received from the various union entities for union business.

Our Findings of Fact show in considerable detail that in addition to the aforementioned expense allowances, petitioner received substantial funds directly from union entities with which he was affiliated as a result of his arrangements whereby union funds were transferred to the Becks' personal bank accounts. Succinctly, a list of such transfers is as follows:

(1) Funds transferred from the Building Association bank account to Beck's bank account in 1950.

(2) Funds transferred from the Western Conference Radio Fund bank account to Beck's bank account in 1951. (The former was a bank account, the existence of which was unknown to the secretary-treasurer of the Western Conference.)

(3) Funds transferred from the Joint Council No. 28 Legal Fund in the years 1948, 1949, 1951, and 1952, to the bank accounts of Lindsay Construction Co., Dave Beck, and B & B Investment Co. (all of which, as aforementioned, were bank accounts of Beck).

(4) Funds transferred from the Joint Council No. 28 General Fund to Beck's bank account in 1951.

(5) Funds transferred from the Joint Council No. 42 Public Relations Division Special Account to the Lindsay Construction Co. account in 1949. (The president of Joint Council No. 42 had no knowledge that the former account even existed.)

(6) Funds transferred in 1949 from the Washington Teamsters' bank account of Joint Council No. 28 to the Lindsay Construction Co. bank account.

Additionally, the Becks received funds indirectly from the union entities through Beck's manipulations of bank accounts. Thus, funds were transferred from Western Conference accounts and other union accounts during the years 1948 to 1953, inclusive, to Nathan Shefferman to reimburse the latter for personal expenditures which he had made on behalf of the Becks. In similar manner, the evidence shows that funds were paid out of the Western Conference coffers in 1952 to Laundry Workers International to reimburse the latter for $6,000 which it had conveyed to Shefferman and which Shefferman had

used on behalf of the Becks for their personal benefit. Likewise, funds were paid out of the Western Conference account to reimburse Verschueren, Sr., for amounts which the latter had expended on behalf of the Becks for their personal benefit.

Still further amounts were paid directly by union entities to third parties during the years 1943 through 1953, inclusive, for the personal benefit of the Becks. Petitioner has not explained to our satisfaction why the International Union paid $278.10 in each of these years as premiums to a life insurance company in his behalf, or why none of these amounts were reported in his Federal income tax returns filed for those years. Likewise, petitioner has not introduced a tenable explanation why the Western Conference paid $5,000 in 1946 on his personal debt to a Seattle bank; why this union entity reimbursed John Lindsay in total amounts up to $21,715.05 in 1950 for payment of Beck's personal bills; or why this union, in 1951 or 1952, made direct payments for Beck's personal expenses in the aggregate amounts of $16,284.12 and $4,339.55, respectively. Similarly, the Western Conference paid Shefferman $9,888.26 on behalf of Beck and Beck has not given us a credible explanation for such payments.

The record is replete with affirmative evidence that Beck caused the union entities involved herein to make substantial payments on his behalf for personal expenditures. Without detailing all of such payments, it is noteworthy that during 1950, the Building Association made payments to Lindsay on behalf of Beck for construction at Sheridan Beach in the aggregate amount of $21,068.85. Likewise, during 1951, the Building Association made payments to Lindsay for personal construction obligations of Beck in the sum of $46,840. Similarly, in 1952, the union paid Lindsay and Eckart Bros. the total amount of $56,207 for construction work at Sheridan Beach, bulldozing at Lazy Valley Ranch, nursery, and tile work. Petitioners failed to present any persuasive explanation for these payments as being other than income to them.

The record shows that during the years 1948 through 1953, inclusive, additional checks totaling $96,660.48, all payable to Shefferman, were drawn at the direction of Beck against funds contained in the Western Conference bank account and in various other union bank accounts. Virtually all of these checks were reflected on the books of the various unions as union expense. In our opinion, Beck's explanation of these transactions was lame and untenable. Considering the affirmative evidence introduced by respondent and the stipulations of petitioners with respect to these transactions, we are convinced that these checks were made payable to Shefferman to reimburse him for expenditures which he made on behalf of and for the personal benefit of the Becks during the taxable period involved.

Further evidence of Beck's technique of siphoning off union funds for his own personal use is found in the fact that during 1948 through 1952, inclusive, $31,051.03 was transferred from the Western Conference's bank account to the bank accounts of Dave Beck, Lindsay Construction (nominee account owned by Beck), and B & B Investment Co. (an account also owned by Beck). Although petitioner acknowledges that these funds were used to promote his personal ventures, he urges that the money was "borrowed" and subsequently repaid when he settled his account with the union. We reject petitioner's argument for reasons to be discussed hereinafter with respect to his alleged "loans" from the union entities.

Another benefit was conferred on the Becks by the International Union in the years 1958 to 1961, inclusive, in the form of an expensive home which the union owned and permitted the Becks to occupy "rent-free" in 1958 [13] and 1959, and at a rental of only $400 per month in 1960 and 1961. The Becks did not report as income in their Federal income tax returns filed for these years the fair rental value of the home. In 1958, they did report $600 as the "fair" rental value of the home; but in 1959, 1960, and 1961, they reported nothing as the fair rental value thereof.

The respondent determined the fair rental value of this home to be $12,000 per year for each of these years. We believe that such a determination is justified and can be verified by computation of the monthly or annual cost of repaying an amortized mortgage loan over a 20- or 30-year period of time. Had the union obtained a $160,000 mortgage on the home at an interest rate of 6 percent, the outlay by the union just to repay the mortgage would have been $13,756.80 on a 20-year mortgage and $11,512.32 on a 30-year mortgage. The fair rental value of the home would of course be higher than the above figures since these figures do not reflect the cost to the union of items such as property taxes, insurance, or upkeep. Moreover, the fair rental value would also have to include a fair profit to the lessor from the rental of the property.

In our consideration of the specific-item method herein, we deem it significant that none of the amounts of income received by the Becks both directly and indirectly from union entities during the years in issue were reported on the Beck's Federal income tax returns for the taxable years involved.

### Repayment of Alleged Loans by Beck

Throughout the instant proceeding, petitioners attempt to explain that their receipt of this constant flow of money from union sources

---

[13] On their returns for 1958, the petitioners reported under "Other income," $200 per month for the first 3 months of 1958, or a total of $600 for "Living quarters—rent free."

cannot be classified as income because the funds thus obtained by them constituted "loans" from the union entities. In our judgment, the record is entirely devoid of any convincing evidence that this was the case. Significantly, in none of the financial statements submitted to the Seattle-First National Bank by Beck was there reflected any indebtedness on his part to any union entity. Also, in the financial statement which Beck furnished to the Occidental Life Insurance Co., in 1951, there was no indebtedness shown on the part of Beck to any union entity. Likewise, in his financial statement submitted to this insurance company in 1951, he admitted having assets in January 1951 totaling $1,052,715.65 and a total liability (consisting of a bank loan from the Security First National Bank of Seattle) of $234,000.

It is also noteworthy that prior to the production of the so-called "accord-and-satisfaction agreement," there was no record whatever of any indebtedness by Beck to any union entity. Beck executed no promissory notes, paid no interest on the amounts allegedly "borrowed" from the union entities, and had no understanding with them as to the terms of repayment.[14] Prior to 1954, Beck had never men-

---

[14] Beck testified with respect to the alleged union loans as follows:

Q. And when you paid them in full—
A. (Interrupting.) In installments, as the audit proceeded, I paid them.
Q. And what was the amount you paid?
A. It was three hundred and seventy thousand and some odd dollars in total.
Mr. CONSTABLE. That is all I have, Your Honor.

\*     \*     \*     \*     \*     \*     \*

CROSS-EXAMINATION

By Mr. HICKOK:

Q. From whom did you borrow the money?
A. I borrowed from the Joint Council Building Association, the Western Conference, and I am not sure as to the Joint Council No. 28. It is all covered in the audit.
Q. The Joint Council Building Association?
A. I think that was its official title, yes.
Q. And what authority did you have to borrow money from them?
A. Well, I was in charge of the organization, I think I had that authority, though I had no specific authority secured by paper or anything of that kind.
Q. Now, how did you go about borrowing this money from the Joint Council Building Association?
A. That was all handled through Fred Verschueren who was the fellow that handled all the financial transactions of every kind for me in and around the building and generally when I was traveling in the United States and Europe.
Q. And what promissory notes did you sign?
A. I signed no promissory notes.
Q. And what were the terms of repayment?
A. There was no terms set forth.
Q. And what was the interest rate?
A. There was no interest rate. It was all moneys that was in commercial banks, no interest to any of them, of the various organizations.
Q. May I have your last answer, please?
A. The money utilized by Fred Verschueren was money that was revolving in commercial banks and was not under any interest received by the organization. It was all commercial money, and commercial accounts.
Q. What did you do with this money?
A. What did I do with the money? The money was expended by Fred Verschueren through John Lindsay and others in connection with the indebtedness.

tioned the existence of any such "loans" from the union entities to his accountant, Mr. Lobe.[15]

The only reference to any such loans, documentary or otherwise, which respondent's agents uncovered in their investigation of the instant case consisted of book entries in the records of B & B Investment Co. showing liabilities owed to the Western Conference and to the Joint Council No. 28 Legal Fund of $15,000 and $4,751, respectively. In an audit conducted in 1956 by a private accounting firm of the union books, no such receivables showed up as loans to Beck. These particular amounts, in any event, had been repaid to those union entities by the International Union in August 1953.

After careful consideration of all the evidence pertaining to the amounts the petitioners received from the union entities during the years before us, we find Beck's testimony with respect to the alleged "loans" incredulous. Manifestly, his testimony in this regard is a transparent attempt to tie in the vast sums received from the union entities with the "accord-and-satisfaction agreement" under which he paid the union entities a total of $370,110.16 in the years 1954, 1956, and 1957. The origin of this "accord-and-satisfaction agreement" (which was executed several months after Beck knew that he was under investigation by special agents and revenue agents of the Internal Revenue Service) makes it clear that the agreement was prompted and instigated by Beck in order to stave off prosecution for tax evasion and/or a deficiency notice for understatement of income tax, including additions for avoidance thereof.

We find no merit in petitioners' contention, on brief, that respondent failed to include the loans in issue in the net worth statement as a liability; that these loans account for substantially all of the alleged unreported income determined by the respondent in the net worth statement; and that to the extent that the loans exceeded the $370,-110.16 repaid to the union, there would be income for forgiveness of the indebtedness in the year forgiven.

Generally, a loan occurs when a borrower receives a sum of money from a lender, pursuant to an agreement or understanding between the parties, whereby the borrower promises to return a like amount of money to the lender at a future time. No promissory note or other written document executed by the parties, or either of them, is necessary to the creation of a loan, express or implied. In either instance, however, agreement or understanding of the parties is essential to the existence

[15] As to his discussion of the loans with Lobe, Beck testified as follows :

Q. And what did you tell Mr. Lobe with respect to the money that you had borrowed from the Building Association?

A. I don't think I ever told Mr. Lobe anything about it because it was more road money, did not constitute income and so why would I tell it to Mr. Lobe.

of a loan. In the instant case, apart from the aforementioned two loans from the Western Conference ($15,000) and the Joint Council No. 28 Legal Fund ($4,751) which were repaid to those union entities by the International Union in 1953, petitioners have not introduced any convincing evidence of a bona fide debtor-creditor relationship between Beck and the union entities involved.

In this connection, we observe that in *Beck* v. *United States*, 298 F. 2d 622, 631 (C.A. 9, 1962), affirming in part and reversing and remanding in part *United States* v. *Beck*, an unreported case (W.D. Wash., 1959, 59-2 U.S.T.C. par. 9486, 3 A.F.T.R. 2d 1364), the appellate court held that the "expense money," i.e., expense allowances, was "distinguishable from loans and embezzled funds." These are the same allowances which are involved in the instant proceeding.

*$22,000 received from Nathan Shefferman in 1948.*—The parties stipulated that on August 2, 1948, a check was drawn on the account of Nathan W. Shefferman in the amount of $22,000 in favor of Dave Beck, Sr., which was deposited to the account of Lindsay Construction Co. at the Seattle-First National Bank, which account was a nominee account of petitioner, and that several years later, petitioner executed a note in that amount dated April 19, 1951, in favor of Shefferman. The $22,000 was not reported on petitioners' 1948 income tax return.

This item of $22,000, as stated in paragraph 22(a) of the stipulation of facts, is part of respondent's documentary evidence to show that petitioners received the specific items of omitted income set forth in his amendment to the answer; the source of the items; and the manner in which they were directed to the petitioners' benefit. At the trial, respondent stated that the item in question is a "net worth item, it is not a fraud item." We believe that respondent meant that this item is intended to corroborate his net worth computation.

The evidence shows that Beck was concerned about his tax liability with respect to the $22,000 received from Shefferman in 1948 and consulted Fred P. Loomis, his financial advisor, in that year concerning its proper treatment for tax purposes. Loomis testified that Beck indicated to him that "he had a partnership back in Illinois which had resulted in about $22,000 in taxable income." Apart from Beck's general testimony that he and Shefferman borrowed money from each other from time to time, petitioner could not recall the purpose of the alleged loan in dispute, nor any of the underlying circumstances. Despite the fact that Beck executed a note in the sum of $22,000 in favor of Shefferman during 1951, about 3 years after receiving this amount from the latter, petitioner has not introduced any evidence to show that a bona fide debtor-creditor relationship existed between

them or that there was any form of repayment or forgiveness of the indebtedness. Under the circumstances, we hold that petitioners received $22,000 in taxable income from Shefferman during the year 1948.

In view of the foregoing, we believe that respondent's use of the specific-item method to corroborate his reconstruction of petitioners' income by the net-worth method has been amply demonstrated. Of the $661,656.98 in total taxable income attributed to the Becks through the net-worth method, all but $152,035.76 was traced back by the respondent and identified as to source. In our opinion, this $152,035.76 difference between the results obtained from using a net-worth approach and those obtained from using a specific-item approach in support thereof is understandable. This amount is the total cumulative difference existing at the end of the 11-year period from the beginning of 1943 through 1953. During those years, Beck had access at all times to large amounts of cash which came from union sources and which he undoubtedly used for the purchase of numerous goods and services of the sort which are reflected in the net worth statement. (The average yearly amount expended by Beck during this period for such items would thus have been approximately $13,820.)

As to the possible source of the aforementioned differential ($152,035.76), we believe Beck obtained such cash from a safe-deposit box at the union hall in which he kept money and jewelry; from Fred Verschueren, Sr., who had taken currency from Beck's safe-deposit box at Beck's direction and used it to pay personal bills of the Becks; and by cashing blank checks which he (Beck) frequently obtained from at least three different union entities. Frank Brewster often signed checks in blank drawn on the accounts of Western Conference of Teamsters, Joint Council No. 28 Building Association, and Joint Council No. 28 Legal Fund and made them available to Beck. Beck often had cash which he had obtained by collecting dues, fines, and assessments from members of union locals and from other sources as well which he would then give to Verschueren for the payment of his (Beck's) personal bills.

In evaluating Beck's testimony we are, of course, cognizant of the elapse of years between the transactions in issue and the date of the instant trial as well as his age and have made allowance for these factors. Bearing this in mind, we nevertheless find that his testimony in the instant proceeding was vague, inconsistent, and contradictory. Without analyzing all of his testimony, we note that his contention that the trip to Europe was almost entirely of a business nature is inconsistent with the testimony of another witness. In the instant trial, Beck testified, in effect, that the trip to Europe was almost wholly a

business trip; yet (at the criminal trial) Theresa Leheny, who accompanied him on the trip, testified, in effect, that this was almost entirely a pleasure trip for Beck.[16] We find it difficult to reconcile Beck's testimony with Theresa's and to attribute this inconsistency in his testimony to forgetfulness or advancing age.

## Fraud

For some of the taxable years in issue, Dave and Dorothy Beck filed separate returns and for others they filed joint returns. Separate returns were filed by the Becks for the years 1943 to 1947, inclusive, and 1958 to 1960, inclusive. They filed joint returns for the years 1948 to 1953, inclusive, and a joint return was filed on behalf of Dave Beck and the Estate of Dorothy Beck for the year 1961. The fraud issue applies only to the years 1943 to 1953, inclusive, and to the year 1958.

Respondent determined that the underreporting by petitioners of their income in their Federal income tax returns for the taxable years 1943 to 1953, inclusive, and for the year 1958, and their underpayment of income taxes for those years were due to fraud with intent on their part to evade taxes. Accordingly, respondent determined that the petitioners are liable for the 50-percent addition to tax provided by section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code, respectively, for each of the taxable years 1943 to 1953, inclusive, and for the year 1958.

Preliminarily, we note that in cases involving the underpayment of taxes where the underpayment was due to fraud and the fraud was the husband's alone, the consequences also attach to the wife for years when joint returns were filed unless the wife (or husband as the case may be) is relieved of such liability for tax (including interest, penalties, and other amounts) under section 6013(e) of the Code of 1954.

Also, we note that the death of one of the taxpayers prior to the trial under such circumstances, of course, will not prevent the assessment and collection of the tax against the decedent's estate.

If any part of the understatement of tax is due to fraud, then the 50-percent addition to the tax attaches to the entire amount of the underpayment. Sec. 293(b), I.R.C. 1939, and sec. 6653(b), I.R.C. 1954, both *supra. Arlette Coat Co.*, 14 T.C. 751 (1950). The burden of proof with respect to fraud is upon the respondent and he must establish fraud on the part of each petitioner by clear and convincing evidence.

---

[16] At the criminal trial, Theresa Leheny testified that during their stay in Europe, she and her husband accompanied Beck when he attended a labor organization meeting in Bridlington, England, for 2 or 3 days; that except for this meeting, neither she nor her husband engaged in business activities during the 11 or 12 weeks they were in Europe, and that during this entire period, she did not serve as secretary for either Beck or her husband.

*Cefalu* v. *Commissioner*, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court.

Our conclusions with respect to the issue of fraud for the taxable years involved are based upon consideration of the entire record properly before us and we are not limited to a consideration of respondent's affirmative evidence. *Frank Imburgia, supra; Wallace H. Petit,* 10 T.C. 1253, 1257 (1948); *L. Schepp Co.,* 25 B.T.A. 419, 440 (1932). We also recognize that in this as in many fraud cases, proof of fraud, if it is to be established, must depend in some respects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences to be drawn therefrom. *M. Rea Gano,* 19 B.T.A. 518, 532 (1930).

Our finding of an understatement in taxable income for each of the petitioners for each of the years in question for the purposes of the deficiencies involved was based in some respects from petitioners' failure to meet their burden of proof. We are mindful that respondent cannot meet his own burden of establishing fraud on the basis of petitioners' failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our findings on that basis. We have held that a mere understatement of income does not establish fraud. *James Nicholson,* 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. *Drieborg* v. *Commissioner,* 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. There must be independent evidence which shows a willful intent to evade tax. In that connection, the Supreme Court in *Spies* v. *United States,* 317 U.S. 492 (1943), said at page 499:

Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * *

In evaluating respondent's evidence, it is also essential to bear in mind that increase in net worth standing alone can not be assumed to be attributable to currently taxable income. *Holland* v. *United States,* 348 U.S. 121 (1954). Where the taxpayer's increase in net worth is substantially in excess of his reported income and where the discrep-

ancy cannot be reasonably explained as being attributable to loans, inheritances, or other nontaxable receipts, the net-worth method furnishes persuasive evidence of unreported income. Proof by the respondent of a likely source of taxable income is sufficient to enable the Court to conclude that unreported income shown by either the net-worth or available-funds method is unreported taxable income. *Dupree* v. *United States*, 218 F. 2d 781, 784 (C.A. 5, 1955).

After a painstaking analysis of all of the evidence in this case and bearing in mind the above-stated principles, we are convinced that petitioners received substantial taxable income during each of the years 1943 through 1953, inclusive, and 1958, in excess of that reported on their individual returns for those years and that in each of those years, a part of each deficiency here involved was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of the deficiency attributable to such fraud, but only that a part of the deficiency is attributable thereto. *United States* v. *Chapman*, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853 (1948). The understatements of income in each of the years 1943 through 1953, inclusive, and 1958, were both substantial in amount and substantial in proportion to reported income of which we have no doubt that petitioners were fully aware.

Even if this case were devoid of the usual indicia of fraud, the courts have held that consistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers, standing alone, is persuasive evidence of fraudulent intent to evade taxes. *Shahadi* v. *Commissioner*, 266 F. 2d 495 (C.A. 3, 1959) ; *Jack M. Chesbro*, 21 T.C. 123, 131 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956).

In *Epstein* v. *United States*, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868 (1957), the court stated at page 566 :

The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir. 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness."

As indicated above in the instant case, the correct net income for each of the years 1943 through 1953, inclusive, greatly exceeded the amount reported by petitioners. Their understatements of income were so large, regular, and frequent, extending over a period of at least 11 years, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully due it.

While the net-worth method is not so precise as to preclude the possibility of minor inaccuracies, facts for each of the years 1943 through 1953, inclusive, preclude the possibility of any inaccuracies of sufficient size to explain away or successfully refute the otherwise obvious inference of deliberate fraud.

In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioners knowingly and intentionally evaded their taxes during the taxable years 1943 through 1953, inclusive. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud.

Initially, we note that failure to cooperate on the part of a taxpayer during an investigation of his tax liability which has the effect of misleading or attempting to conceal facts is a circumstantial fact indicative of fraud. *May E. Kaderly*, 21 B.T.A. 582, 583 (1930) ; *Joseph Calafato*, 42 B.T.A. 881, 890 (1940). Here the record shows that petitioner's conduct during respondent's investigation was designed to mislead, obstruct, and hinder respondent's agents for the purpose of concealing facts. In this connection, we note that in March 1954, two revenue agents told Beck that his 1949 return was to be reexamined and requested that he furnish his books and records for that purpose. Beck did not make them available to the agents. Also, the record discloses that within a month after Beck was notified that his tax affairs were being investigated, union records of the Western Conference and the Building Association for 1953 and all prior years were taken from the office of these union entities and burned at the city dump under the surveillance of two unidentified men. In our judgment, Beck caused the deliberate destruction of these records in order to obstruct respondent's investigation of his tax liability. Destruction of records under the circumstances set forth in our Findings is evidence of fraud. *Prokop* v. *Commissioner*, 254 F. 2d 544 (C.A. 7, 1958), affirming a Memorandum Opinion of this Court.

Also, the evidence shows that Beck attempted to place third-party records beyond the reach of the revenue agents where such records had a bearing on his fiscal affairs. Likewise, in 1954, he obtained the return of his financial statement which he had submitted in 1951 to the Occidental Life Insurance Co. in order to support his loan applications. He was unsuccessful in his attempt to obtain the return of other financial statements filed with the Seattle-First National Bank. In addition to this chicanery, petitioners furnished false information to the revenue agents through their accountant, Lobe, concerning their trip to Europe in 1949. Further artifice was employed by Beck in the

contrivance of a series of documents purporting to show that he had authority to and did "borrow" money from the union entities during the years under investigation. In our view these documents were complete fabrications. Significantly, Sam DeMoss, an official of the Western Conference, refused to sign one of the aforementioned documents, i.e., the so-called affidavit because it contained erroneous statements; and William E. Franklin, another key official of this union, signed it under protest.

Petitioners, on brief, contend that the money which Beck borrowed from the unions was handled by Verschueren, Sr., because Beck traveled too much; that Verschueren, Sr., was under specific instructions from Beck to keep complete records of these loans; and that Verschueren, Sr., who handled all of Beck's financial transactions while he was traveling, failed to keep an accurate record of the loans involved. Petitioners contend further that Beck also told John Lindsay, Jr., to keep an accurate accounting of the union loans which were related to his activities with petitioner. Suffice it to say at this point that we do not believe these explanations. In the context of this case, moreover, petitioners cannot escape their responsibility by attempting to shift the blame to another.[17] *Dorothy L. Sutherland*, 32 T.C. 862, 866, 868 (1959) ; *Cefalu* v. *Commissioner*, *supra; M. Rea Gano*, *supra; Sol H. Goldberg*, 36 B.T.A. 44 (1937) ; and *Russell C. Mauch*, 35 B.T.A. 617 (1937), affd. 113 F. 2d 555 (C.A. 3, 1940).

Furthermore, the evidence shows that when the Becks' Federal income tax returns were being prepared for them by their accountants for the taxable period involved, Beck knowingly withheld information necessary to the preparation of honest and accurate returns. Beck did not disclose to his accountants the receipt of the expense allowances; nor did he inform his accountants of the existence of his or his wife's bank accounts although he had sufficient knowledge of tax matters to know the result of such nondisclosure would be underreporting of income and underpayment of tax.

In order to conceal further income from the taxing authorities, Beck used several nominee bank accounts and had assets, including stock (with respect to which he and his wife failed to report or pay tax on dividends which they received and gain which they realized upon the sale thereof), held by various nominees. The failure of a taxpayer to report and pay tax on income deposited in fictitious bank accounts in our judgment is a badge of fraud. Likewise, the distribution of unreported earnings from Sick's stock to a nominee, D. W. Marshall, is another indicia of fraud.

---

[17] Verschueren, Sr., died subsequent to the petitioner's criminal trial at which the loans in question were also in issue and he was not called as a witness in the criminal trial.

Turning to the "expense allowances" which accounted for a substantial amount of petitioners' unreported income, while it may or may not be true that some portions of union funds were obtained by Beck through illicit means, we are convinced that the expense allowances involved herein were compensation to him. These allowances were paid to him steadily by the union entities throughout all of the net worth period. All of the union officials who were in a position to prevent Beck from receiving and using these expense allowances for his and his wife's personal purposes knew that the money was being paid to and used by the Becks in this manner.[18] Apparently, they never questioned Beck's right to so use these allowances, nor did they require him to provide any accounting whatsoever therefor. Petitioners, on reply brief, argue that although they agree that the expense allowances were taxable income to them, the record demonstrates that these allowances were "completely offset" by cash expenditures for deductible travel and entertainment. Petitioners have failed to introduce any convincing evidence to support their argument and they cannot be relieved of their burden of proof because of the lapse of time between the years involved and the date of trial. We find that these expense allowances in the circumstances herein constituted compensation to Beck for services rendered within the ambit of sections 22(a) of the 1939 Code and 61(a) of the 1954 Code.

While it is clear that the expense allowances were compensation during all of the years 1943 to 1953, inclusive, it is not entirely clear whether and to what extent the remaining funds obtained by Beck from union sources constituted compensation, embezzlement proceeds, or the fruits of some form of larceny other than embezzlement. Petitioners, on reply brief, contend that the union funds involved, with the exception of the expense allowances (for which petitioner made deductible cash expenditures), were advances to Beck in the form of loans from the unions and that none of these funds was embezzled. Without deciding the exact character of the funds involved, other than the expense allowances, we believe that under the facts of record, all of these properly would be classified as income herein. See *James* v. *United States*, 366 U.S. 213 (1961). As to the issue of fraud, regardless of how the remaining funds received by Beck may be classified, petitioners' failure to report the expense allowances constitutes

---

[18] The constitution of the International, as adopted in 1952, provided in art. V, sec. 1(f), *inter alia,* that all executive officers, when traveling in the interest of the organization, shall receive their fare in addition to their salary to and from their destination, and in addition a sum of $15 per day for hotel expense. The general president, or other executive officers of the International, shall be allowed $7.50 per day for incidental expenses.
The parties stipulated that this same provision has been included in the constitution for all of the years 1943 through 1958, inclusive, however, hotel and incidental expense allowances have been adjusted at various times during these years.

significant evidence of fraud during each of the taxable years 1943 through 1953, inclusive.

Our scrutiny of the record discloses that petitioners had knowledge of the tax laws relating to the expense allowances in dispute and their tax liability. The Becks were admonished in three prior audits of their returns prior to the years before us (in 1934, 1938, and 1943) that the expense allowances received from the unions were includable in their income. They agreed to and paid the additional tax on the unreported income and in one case a negligence penalty. Dorothy Beck, who actually kept the Becks' financial records, was present at and actively participated in at least one of the conferences with the revenue agent concerning this matter.

Despite their awareness of the includability of these expense allowances in their returns as income, the Becks systematically omitted them entirely from their income tax returns continuously throughout the years 1943 to 1953, inclusive. During all of these years, these allowances were deposited in Dorothy Beck's bank account. That the failure to report income and pay the taxes thereon is due to fraud is particularly evident where it can be presumed that the taxpayer has some familiarity with the tax law and its requirements. See *J. K. Vise*, *supra*.

Ostensibly, the extensive net-worth and specific-item analysis in the instant proceeding reveals that the Becks enjoyed a standard of living of far greater magnitude than would have been possible had they received only the net income actually reported by them in their returns filed for the years involved. We find it inconceivable that the Becks were unaware of the discrepancy between their actual and their reported income under such circumstances.

Respondent determined that petitioners are liable for the fraud penalty with respect to their separate returns for the years 1943 through 1947, inclusive, and their joint returns filed for 1948 through 1953, inclusive. Sec. 293(b), I.R.C. 1939, and sec. 6653(b), I.R.C. 1954, *supra*. Petitioners, in essence, contend that Dorothy Beck was inert in her husband's financial affairs and had no actual knowledge of his wrongful conduct respecting the deficiencies in tax involved in the returns filed for the taxable years before us and hence, the addition to tax for fraud should not be imposed on her separate returns, nor should she be held jointly and severally liable for the taxes due with respect to their joint returns. We disagree.

As to the separate returns for the years 1943 through 1947, it is our opinion that respondent has established by clear and convincing evidence that Dorothy Beck significantly benefited from the items which we have found her husband omitted from gross income during the

years 1943 through 1947, inclusive, when she filed separate returns; and that she must have been and was cognizant of the substantial difference between their actual and her community share of reported income during that period. During all of these years, the unreported expense allowances which her husband received from the union entities were deposited in her bank account and we believe that she was aware of the sources and nature of this money. Absent any evidence to the contrary, we are convinced that respondent has carried his burden of proof with respect to her separate returns for the years involved.

Concerning the joint returns in controversy, we note that Public Law 91–679, 84 Stat. 2063, which was enacted on January 12, 1971, and which is applicable to all years to which the Internal Revenue Code of 1954 applies, amended section 6653(b) [19] of the Code by adding the final sentence thereof, and amended section 6013 of the Code, which provides in part as follows:

SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE

(a) JOINT RETURNS.—A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, except as provided below:

\*       \*       \*       \*       \*       \*       \*

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

We have carefully considered all of the evidence of record and have concluded that petitioner Dorothy E. Beck is not entitled to the relief

[19] SEC. 6653. FAILURE TO PAY TAX.

(b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

provided by section 6013(e) with respect to the joint returns filed for 1948 through 1953. It is apparent from the facts that in each of these years the amount omitted from gross income was in excess of 25 percent of the gross income reported. Unfortunately, Dorothy E. Beck was deceased at the time of the instant trial and her administrator did not testify with regard to any of the omissions which we have found were made on their joint returns. In the absence of their testimony, we have no knowledge that Dorothy E. Beck did not know, nor had reason to know of, the omissions from gross income when she signed the joint returns in question. More important, however, the record is clear that she benefited significantly, directly or indirectly, from the items omitted from gross income during the years involved and taking into account all other facts and circumstances, we cannot relieve her of liability for the deficiencies in tax and additions thereto (interest, penalties, and other amounts) for the taxable years involved attributable to such omission from gross income. Having determined above that for the joint-return years at issue, Dorothy Beck was aware of and participated in the fraudulent understatement of income reported therein, section 6653(b) affords her estate no relief from liability for additions to tax for fraud.

Upon the basis of the foregoing and consideration of the record as a whole, we hold that respondent has proved by clear and convincing evidence that a part of the deficiency in each of the taxable years 1943 through 1953, inclusive, was due to fraud on the part of the petitioners with intent to evade taxes and, therefore, his determination of additions to tax based on section 6653(b) for such years is upheld.

During the taxable year 1958, Beck received a travel expense allowance in the amount of $1,514.95 from the International Union which he reported in his separate return filed for that year but he obliterated the tax effect thereon by deducting in the same return a like amount for "travel expenses expended." Dorothy Beck received her split-income benefit of this deduction through the filing of a separate return for that year in which she claimed one-half of the total income and deductions set forth in the 1958 return filed by her husband. Respondent disallowed the deduction as not having been expended for business purposes and treated the claimed deduction as a basis for the imposition of the fraud penalty in that year with respect to both petitioners.

Originally in the petitions filed in docket Nos. 858–66 to 861–66, inclusive, the petitioners did not contest the respondent's disallowance of the claimed deduction of $1,514.95 in alleged travel expenses for 1958. However, at the instant trial, the petitioners orally amended their petitions in order to place this item in issue.

Petitioner did not maintain any records of the alleged travel and

entertainment expenses in question. He argues in a general and conclusory manner that they had a considerable amount of business expense in 1958. His explanation that he had many out-of-pocket expenditures for business dinners, business gifts, and paying for luncheons attended by his lawyers and accountants during his criminal trial in Tacoma finds no support in the record. Beck produced a series of checks in an attempt to establish that he had other unclaimed business expenses in 1958 which he should be entitled to deduct in place of these unproved travel expenses. These checks were summarized in their entirety from Beck's books and records by Revenue Agent Garrett at the trial and the summary was received in evidence. In every single instance the checks proved, from an examination of Beck's books and records, to be for personal items.

No documentary evidence was offered by Beck to substantiate the business nature of a single expense item for 1958 and the record does not warrant the allowance of any part of the $1,514.95 as a deduction in that year. Petitioners have failed to carry their burden of showing error in respondent's determination. Upon the basis of the foregoing and the record as a whole, we sustain respondent's disallowance of the claimed deduction with respect to both petitioners.

Additional evidence of fraud for the year 1958 is found in the Becks' failure to report in their separate returns for that year the full fair rental value of the home provided for them by the International Union when they were well aware of the value of the house since they themselves sold it to the union. During the years 1958 and 1959, the Becks paid no money to the International as rental on the house. In their Federal income tax returns filed for 1958, the Becks added to their reported income the amount of $600 and represented that amount as the value to them of the living quarters for the first 3 months of that year. In the return filed by Dave Beck, he explained that since he was not in the employ of the International for the last 9 months of 1958, he believed that the house was a "gift" to him.

We do not believe that the home was a "gift" from the union. In order for there to be a gift, there must be a donative intent. There is no evidence that the International regarded this home as a gift to Dave Beck. In our judgment, the failure of petitioner to report the constructive receipt of income from the fair rental value of the home, $12,000 in 1958 as determined by respondent, is convincing evidence of fraud.

In the light of the foregoing and the record as a whole, we hold that petitioner has understated his taxable income in his separate return for the year 1958 by deliberately overstating his deductions and failing to report the constructive receipt of income derived from the

fair rental value of his residence. Respondent has met his burden of proof and the addition to tax for fraud under section 6653(b), *supra*, is sustained.

Turning to the addition to tax for fraud in Dorothy Beck's separate return for 1958, we have found that she must have known of the deliberate understatement of income by her husband in their joint returns filed for 1948 through 1953, inclusive, and for other reasons discussed hereinabove, we have sustained respondent's imposition of the fraud penalty for those years. However, it is axiomatic that respondent must prove fraud on the part of the taxpayer filing a separate return for the particular year in issue. Fraud is never to be presumed; it implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed and we should not reach a conclusion of fraud upon circumstances which at most create suspicion. *Tsuneo Otsuki*, 53 T.C. 96, 112 (1969).

Here, respondent has not introduced any affirmative evidence to show that Dorothy Beck participated in any of her husband's business activities during the taxable year 1958, other than socializing with and entertaining union personnel. Nor did respondent establish that she had any recent knowledge as to how her husband reported travel allowances or expenditures on his returns. There is no evidence that Dave Beck discussed the travel allowances ($1,514.95) and/or the fair rental value of their residence ($1,000 per month) with his wife; that she was in any way party to the concealment of such income; that she attempted to conceal any income of her own; or that she had knowledge of her husband's fraudulent acts with respect to the taxable year 1958.

We are aware that Dorothy Beck was present and actively participated in two audit conferences in 1938 and 1943 with revenue agents when her husband was told by them to report expense allowances received by him from the unions on his or their Federal income tax returns and that during the course of one of these audits Beck stated that his wife kept their records. Nevertheless, it is incumbent upon respondent to prove by clear and convincing evidence her fraudulent conduct as to the taxable year 1958 and he cannot predicate a finding of fraud on her general knowledge of her husband's business affairs and reporting techniques dating back some 20 years before the instant trial.

Respondent has also based his fraud penalty with respect to Dorothy Beck on the fact that she failed to report in her separate return for 1958 her community share of the full fair rental value of the home ($1,000 per month) provided for her and her husband by the International Union. Although there is a strong suspicion that she knew

that the fair rental value of their residence was more than that reported in their separate returns, we do not believe that this understatement of income and the deduction of the aforementioned travel expense ($1,514.95) under the circumstances was clear and convincing proof of fraud with the intent to avoid tax on her part. In short, the affirmative evidence is insufficient to uphold respondent's imposition of the addition to tax for fraud as to Dorothy Beck for the year 1958.

The administrator *de bonis non* of Dorothy Beck's estate waived the statute of limitations by executing Form 872 and extended the period for assessment of deficiencies against her until December 31, 1965. Respondent's notice of deficiency is dated December 10, 1965. Accordingly, although we find Dorothy Beck innocent of fraud as to the taxable year 1958, she is nevertheless liable for the income tax deficiency as determined by respondent.

Our finding as to the fraud issue disposes of the issue concerning the statute of limitations.

### *Sunset Distributors, Inc.—$85,000*

Respondent determined that in 1960 the petitioners in docket Nos. 858–66 and 860–66 received $85,000 in ordinary income as a result of the deeding of a building to Beck's wholly owned corporation (Regrade Improvement Co., Inc.) by Sunset Distributors, Inc. Petitioners contend that they did not realize taxable income by virtue of that transaction for the reason that, at the time of the transfer, the property was encumbered by a mortgage in an amount equal to its fair market value.

In 1960, Beck filed a lawsuit against Sunset Distributors, Inc., in which he claimed, among other things, that Sunset was indebted to him in the amount of $95,000 as compensation for services rendered to it during the years 1950 through 1959. In 1960, the suit was settled by the deeding to Beck's wholly owned corporation (Regrade Improvement Co., Inc.) by Sunset of a building which had a fair market value of $85,000. This property was encumbered by an $85,000 mortgage which had been placed upon it by Sunset about a month before the property was deeded to Beck's corporation. Sunset retained the obligation to pay off the mortgage loan notwithstanding the aforementioned conveyance of the property to Beck's corporation. The parties have agreed that the fair market value of this property was $85,000. In addition, the parties to the transfer executed a lease dated December 15, 1960, which provided, among other things, that Beck as lessor would receive rent in the aggregate amount of $120,000 over a 10-year period from Sunset, and that the latter would be responsible for all

necessary repairs to the interior and for any increase in real estate taxes over those levied in 1960.

In his separate return filed for 1960, Beck reported this transaction as one involving the sale of his "stock" in Sunset Distributors, Inc., and that it resulted in "nonreportable capital gain." Beck did not at any time own stock in Sunset.

At the outset, we note that it is well settled that a deficiency may be approved on the basis of reasons other than those relied upon by the respondent or even where his reasons may be incorrect. *Wilkes-Barre Carriage Co.*, 39 T.C. 839, 845 (1963), aff'd. 332 F.2d 421 (C.A. 2, 1964); *Max Schuster*, 50 T.C. 98 (1968); *Bennett's Travel Bureau, Inc.*, 29 T.C. 350, 356–357 (1957), and cases cited therein.

Compensation is, of course, ordinary income to the recipient and not capital gain. Furthermore, the building in question, as well as Sunset's retention of the obligation to pay the existing mortgage on the building and the present worth of the lease thereon, retained their quality as compensation even though they were obtained by Beck through the compromise of a lawsuit and he received the compensation in the form of property, including the lease, rather than in cash. Section 1.61–2(d), Income Tax Regs., establishes rules for the taxation of compensation which is paid other than in cash. Subparagraph (2)(i) under that paragraph provides that:

if property [other than a stock option] is transferred by an employer to an employee, or if property is transferred to an independent contractor, as compensation for services for an amount less than its fair market value, then regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the employee or independent contractor. * * *

We believe this regulation is a reasonable implementation of the statute. If petitioner received property as compensation for services, the fair market value of the property received by him at the time of transfer in 1960 is compensation and must be included in gross income in that year.

The burden of overcoming respondent's determination is on petitioners; and in our view, the proof on this issue falls far short of that necessary for carrying this burden. We reject petitioners' contention that no monetary value can be found in the deeding of the building to Beck in 1960 in settlement of his lawsuit against Sunset. The mere assertion without substantiation by Sunset's accountant that Sunset had a "negative net worth" in 1960 is not sufficient to meet petitioners' burden of proving by a preponderance of the evidence that they did not receive anything of value as a result of the settlement. Except for the deed to the building, this mortgage thereon, a

lease agreement between Sunset and Beck, and some conclusory testimony, petitioners did not introduce any cogent evidence with respect to all of the terms of the settlement agreement. We do not know whether or not this settlement was formalized in writing. In dealing with an unusual transaction such as this, it is unrealistic to accept without further inquiry the deed and mortgage evidencing the transaction under review as embodiments of the substance of what actually transpired. Yet this is what petitioners would have us do.

The mortgage dated November 1960, signed by the president of Sunset as mortgagor, states that Sunset received $85,000, which is "evidenced by one promissory note of even date executed by the mortgagor." However, neither this note nor a copy thereof has been introduced into evidence and we have no knowledge of its terms, including the duration of the mortgage. The record does not disclose what arrangements the Becks (or Beck's wholly owned corporation) might have had with Sunset with respect to just when Sunset would pay off the mortgage indebtedness. The record does not show whether Sunset's mortgage obligations were guaranteed by its shareholders. Nor does the record disclose whether additional property had been pledged to secure the mortgage loan. It would seem that the mortgagee would have required additional collateral since the loan equaled the agreed fair market value of the building. Also, we are not apprised of the purpose or use of the loan. Petitioners have chosen to leave us completely in the dark as to these matters.

It is clear that the Becks assumed no liability to pay off any portion of the $85,000 indebtedness when the property was deeded to Beck's wholly owned corporation. Sunset continued to be the obligor as to such liability. In the absence of evidence to the contrary, the obligation of Sunset for the payment of the indebtedness was that of a primary obligor; and we have no evidence to indicate that Sunset would not live up to its obligation.[20]

At first blush, petitioners' primary contention is an appealing one for it would appear that at the date of the transfer of the building to Regrade, Beck received no taxable income because the $85,000 encumbrance equaled the agreed fair market value of the building. However, looking to the substance of the overall transaction pertaining to the building, we believe that petitioner bargained for and obtained substantially more than the building at the time his lawsuit was settled.

While the record does not disclose the exact date in 1960 of the

---

[20] It is inconceivable to us that the lending bank would lend $85,000 to a financially defunct borrower, particularly where the fair market value of the collateral is not in excess of the amount borrowed.

settlement of the lawsuit, we know that a series of transactions occurred within several weeks, all relating to the building in question. On November 1, 1960, the building was mortgaged by Sunset; then on December 7, 1960, the building was deeded to Regrade Improvement Co. and on December 15, 1960, the parties executed the 10-year lease agreement providing for payment of rent to Regrade in the total amount of $120,000. Viewing the evidence in its entirety, we conclude that these transactions were all part of an integral plan for the settlement of the litigation in favor of petitioner.

Although the issue was one of material significance, petitioner did not introduce any witness who was a party to the settlement agreement who could have shed some light on the overall transaction, nor has he explained their unavailability. We can hardly infer that they would have been favorable to petitioner. *Wichita Terminal Elevator Co., supra.*

Undoubtedly Sunset's retention of its obligation to pay the Seattle-First National Bank the $85,000 indebtedness had substantial value to Beck in 1960 and its value, of course, would be greater, depending on the duration of the underlying note. Although this value constitutes taxable income to Beck in 1960, in the absence of sufficient evidence, we find it difficult to ascertain the amount thereof with any exactitude. However, an approximation of such value will not be necessary for resolution of the issue herein since the lease agreement represents cogent evidence of the fair market value of property received by Beck in the overall transaction. The lease in question was introduced into evidence at the trial by petitioners and it is conceivable that respondent did not have an opportunity to consider the fair market value of this lease when determining the deficiency in issue in his statutory notice.

We must, therefore, consider the question as to what, if any, fair market value this lease had in 1960. Difficult as the task is, it is not insuperable and we think that a fair market value can be found on the evidence before us.

It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being informed of the material considerations. Of course, the fair market value of a lease at a particular time is a question of fact to be determined from all the circumstances connected with the rental agreement and there is no single formula universally applicable in determining such value. *Meadow Land and Impr. Co.* v. *Commissioner*, 124 F. 2d 297 (C.A. 3, 1941); *Westland Co.*, 15 B.T.A. 553 (1929). Moreover, it is not necessary that the value arrived at by us be a figure as to

which there is specific testimony if it is within the range of figures that may properly be deduced from the evidence. *Archer* v. *Commissioner*, 227 F. 2d 270, 273 (C.A. 5, 1955); *Elverson Corporation*, 40 B.T.A. 615 (1939), affd. 122 F. 2d 295 (C.A. 2, 1941).

In the instant case, the evidence introduced by petitioner does not present a situation which is readily adaptable to the determination of an exact figure. Using our best judgment on the entire record, it is our conclusion and we so find as a fact that the lease had an approximate and reasonable present worth of $90,000 when executed on December 15, 1960, as part of Beck's settlement of his lawsuit for compensation for services rendered in the sum of $95,000, and accordingly the present worth of the lease in 1960 constitutes ordinary income to petitioner though in the lesser amount determined by respondent.

In view of the foregoing, we sustain respondent's determination on this issue.

### Interest Deductions

Respondent determined that the Becks (in docket Nos. 858–66 and 860–66) are not entitled to deduct from their Federal income tax in 1960 alleged interest expenses paid on behalf of C. N. Lantz and Dave Beck, Jr., in the respective amounts of $597.14 and $453.34, and (in docket Nos. 859–66 and 861–66) that the Becks are not entitled to deduct from their Federal income taxes in 1961 alleged interest expenses paid on behalf of C. N. Lantz and Dave Beck, Jr., in the respective amounts of $1,360.24 and $610.24.

Petitioners, in their petition, allege that Dave Beck had borrowed money from Lantz and Dave Beck, Jr., during 1960 and 1961, that Lantz and Dave Beck, Jr., had borrowed this money from a bank; and that petitioner paid the interest obligation of Lantz and Dave Beck, Jr., directly to the bank. The petitioners produced no evidence whatever concerning the alleged interest payments to or on behalf of C. N. Lantz or Dave Beck, Jr. For failure of proof, we uphold respondent's determination on this issue.

### Auto Expenses

For the taxable years 1959, 1960, and 1961, petitioners claimed deductible travel expenses on their income tax in the respective amounts of $2,263.64, $2,173.33, and $2,104.67. At the trial, the petitioners submitted checks and accompanying testimony in support of automobile and other expenses equaling or in excess of the amounts claimed on the returns and disallowed by respondent. In their pleadings, they did not contest respondent's disallowance of such amounts for the taxable years involved. At the trial, the Court permitted petitioners to amend

378

their pleadings to claim additional deductions reflected by the afore-mentioned checks.

In our opinion, Beck had very little, if any, independent knowledge of the exact purpose of the checks which were introduced to support the deductions in question. Apparently these checks related to expenditures made after Beck ceased to be president of the International Union in the fall of 1958. No definitive or probative evidence was presented by petitioners to demonstrate that they incurred deductible expenses equal to or in excess of the amounts disallowed by respondent.

Accordingly, respondent's determination as to this issue will not be disturbed.

### Additions to tax, section 294(d)(2), I.R.C. 1939

Respondent determined that the petitioners in docket Nos. 858–66 and 861–66, inclusive, are liable for the additions to tax provided by section 294(d)(2) of the 1939 Code for the years 1945 to 1952, inclusive, by reason of substantial underestimations of taxes in the declarations of estimated taxes filed by them for those years.

Under section 294(d)(2) of the 1939 Code, if 80 percent of the actual tax due in a given year exceeds the taxpayer's estimated tax for that year, then there has been a substantial underestimate of tax within the meaning of that section and the addition to tax provided therein will apply.

The petitioners did in fact substantially underestimate their taxes in the declarations of taxes which they filed in these years.

Accordingly, the additions to taxes which apply to the underestimated amounts follow automatically from the deficiencies as finally determined in these cases.

*Decisions will be entered under Rule 50.*